767 F.2d 1573
 Bankr. L. Rep. P 70,691
In re NORTH AMERICAN COIN & CURRENCY, LTD., Debtor.
Daniel A. TORRES, M.D., P.C. and Arthur R. Rose and Kathleen
Rose, et al., Plaintiffs/Appellants,
v.
Harry V. EASTLICK, successor Trustee of North American Coin
& Currency, Ltd., North American Coin & Currency, Ltd., An
Arizona corp., John Does I through X, Jane Does I through X,
White Corp., I through V, Defendants/Appellees.
 No. 84-1731.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 12, 1984.
Decided Aug. 6, 1985.
 
 James M. Marlar, Ryley, Carlock & Applewhite, Marshall A. Lehman, Mahoney, Lehman & Rood, P.C., Phoenix, Ariz., for plaintiffs/appellants.
 Jeffrey S. Leonard, Phoenix, Ariz., for defendants/appellees.
 Appeal from the United States District Court for the District of Arizona.
 Before MERRILL, CANBY and NORRIS, Circuit Judges.
 CANBY, Circuit Judge:
 
 
 1
 North American Coin and Currency, Ltd. (hereinafter NAC or debtor) was an Arizona corporation in the business of buying and selling precious metals. The appellants are former customers of NAC who placed orders with the company and paid for them during the week of September 13, 1982, immediately before NAC filed for voluntary reorganization under Chapter 11 of the Bankruptcy Code. They brought this class action against the Bankruptcy Trustee, seeking to recover their funds from the bankruptcy estate. They claim that the trustee holds the funds in constructive trust for them because the debtor obtained the money by fraud or misrepresentation. On cross-motions for summary judgment, the bankruptcy court found for the trustee. The district court affirmed. We have jurisdiction over the appeal pursuant to 28 U.S.C. Sec. 1291, and we affirm.
 
 
 2
 The parties agree that no genuine issues of material fact exist for purposes of review of the summary judgment in favor of the trustee. They characterize the facts differently, however, and they draw different inferences from those facts. We set forth the facts in the light most favorable to the plaintiff class, against whom summary judgment was granted. See Ybarra v. Reno Thunderbird Mobile Home Village, 723 F.2d 675 (9th Cir.1984).
 
 
 3
 In the weeks prior to September 13, 1982, NAC suffered severe financial losses as a result of certain transactions initiated by the company president, Sherman Unkefer. On September 12, several men responsible for the daily operation of the company ("the principals") met to discuss the situation.[1] The NAC comptroller, David Weekly, who was present at the meeting, testified in deposition that the principals perceived ongoing mismanagement by Unkefer which was endangering the company's clients and employees. They believed that NAC was no longer operating soundly, and expressed doubts about the company's continued existence as a going concern. They perceived themselves as faced with two options. One choice was a mass resignation or disaffiliation, which in their view would have caused the immediate collapse of the company. The other choice was to operate the company for one more week in anticipation of a meeting of the NAC directors and stockholders the following weekend. The principals believed that the stockholders might infuse new capital into the company to keep it operating.
 
 
 4
 The principals chose to try to prevent the company from collapsing. They devised an emergency plan, which was carried out with Unkefer's approval. They created a bank account, labelled a "Special Trust Account," into which the company placed all receipts from new transactions during the week of September 13 through September 17. According to the company's lawyer, Joel Sacks, the purpose of the account was to protect new NAC customers in case the company did not survive. The trust account funds were not intended for use as operating money for the company. If the board of directors voted to keep the company alive, then the money was to be used to fill the customers' orders for precious metals in the regular course of business. If the company ceased operations, the principals anticipated that the customers would get their money back.
 
 
 5
 Between September 13, 1982, and September 20, 1982, the members of the plaintiff class placed nearly $600,000 worth of orders with NAC, and gave NAC the money to carry out the transactions. NAC deposited these funds into the "Special Trust Account" which had been set up at the North American Bank. The plaintiffs, however, never received the commodities that they ordered. NAC filed a Chapter 11 petition for reorganization on September 23, 1982. The funds in the "Special Trust Account" remain intact. The plaintiffs now assert that the trustee for NAC holds those funds in constructive trust for them.
 
 
 6
 Property that is truly in trust is not "property of the [trustee's] estate "within the meaning of section 541 of the Bankruptcy Code, 11 U.S.C. Sec. 541. Plaintiffs argue that the same result must follow for property that is subject to a constructive trust. They further contend that, because the existence and nature of the debtor's interests in property are determined by reference to state law, 4 Collier on Bankruptcy, Sec. 541.02 (15th ed. 1979), they are entitled to all of the funds in the Special Account if Arizona law would view those funds as subject to a constructive trust.
 
 
 7
 While we agree that any constructive trust that is given effect must be a creature of Arizona law, we cannot accept the proposition that the bankruptcy estate is automatically deprived of any funds that state law might find subject to a constructive trust. We refuted that proposition in In re Esgro, Inc., 645 F.2d 794, 797 (9th Cir.1981) and Elliott v. Bumb, 356 F.2d 749, 753 (9th Cir.), cert. denied, 385 U.S. 829, 87 S.Ct. 67, 17 L.Ed.2d 66 (1966), where we held that, because of countervailing policies behind the Bankruptcy Act, state law could not be permitted to impose a trust on commingled property of a bankrupt's estate. A constructive trust is not the same kind of interest in property as a joint tenancy or a remainder. It is a remedy, flexibly fashioned in equity to provide relief where a balancing of interests in the context of a particular case seems to call for it. See Raestle v. Whitson, 119 Ariz. 524, 582 P.2d 170 (1978). Moreover, in the case presented here it is an inchoate remedy; we are not dealing with property that a state court decree has in the past placed under a constructive trust. We necessarily act very cautiously in exercising such a relatively undefined equitable power in favor of one group of potential creditors at the expense of other creditors, for ratable distribution among all creditors is one of the strongest policies behind the bankruptcy laws. See In re Visiting Home Services, Inc., 643 F.2d 1356, 1360 (9th Cir.1981); Hassen v. Jonas, 373 F.2d 880, 881 (9th Cir.1967).
 
 
 8
 While state law must be applied in a manner consistent with federal bankruptcy law, Johnson v. First National Bank of Montevideo, Minnesota, 719 F.2d 270 (8th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984), we do not suggest that it is irrelevant. Arizona law permits the imposition of a constructive trust "whenever title to property has been obtained through actual fraud, misrepresentation, concealment, undue influence, duress, or through any other means which render it unconscionable for the holder of legal title to retain and enjoy its beneficial interest." In re Estate of Rose, 108 Ariz. 101, 104, 493 P.2d 112, 115 (1972).
 
 
 9
 In permitting the imposition of a constructive trust for actions amounting to actual fraud, Arizona law is not inconsistent with federal bankruptcy law. Bankruptcy trustees have been held to have no interest in property acquired by fraud of bankrupts, as against the rightful owners of the property. In re Flight Transportation Securities Litigation, 730 F.2d 1128, 1136 (8th Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 1169, 84 L.Ed.2d 320 (1985); In re Paragon Securities Co., 589 F.2d 1240, 1242 (3rd Cir.1978); Nicklaus v. Bank of Russellville, 336 F.2d 144, 146 (8th Cir.1964). The principle underlying this rule is that the creditors should not benefit from fraud at the expense of those who have been defrauded.
 
 
 10
 We do not find in this record, however, evidence to establish fraud. The plaintiffs do not contend, nor is there any evidence, that NAC committed any affirmative misrepresentations that induced them to do business with the company before it became insolvent. They were never promised that any special measures would be taken to protect their investments.[2] Rather, the plaintiffs' theory is that NAC committed a fraud simply by accepting new orders during the last week of its existence. The plaintiffs argue that NAC's managers took plaintiffs' money knowing that the company was insolvent and could not fill their orders. That conduct was fraudulent, the plaintiffs contend, because NAC did not reveal its dire financial trouble. Instead, the principals falsely held out the appearance of a viable operation in order to keep the company from collapsing.
 
 
 11
 We are not without guidance in determining when a transaction undertaken by a debtor shortly before insolvency amounts to a fraud on those with whom he deals. In Arizona, as elsewhere, "actual fraud" is characterized by a willful intent to deceive. Smith v. Pinner, 68 Ariz. 115, 201 P.2d 741 (1949). The debtor commits fraud, even though he has made no affirmative false representations, if he commits himself to a transaction with no intention of carrying it out. An intention not to carry out the transaction--in other words, a fraudulent intent--may be inferred where the debtor conceals his insolvency knowing that his financial situation is so hopeless that he can never meet the obligation he has acquired. In re Paragon Securities Co., 589 F.2d 1240, 1244 (3d Cir.1978); Rochford v. New York Fruit Auction Corp., 116 F.2d 584, 585 (2d Cir.1940). However, the debtor's mere failure to disclose his insolvency, without more, does not constitute a fraud entitling the creditor to rescind the transaction. Id. If the debtor believes in good faith that he will be able to carry out the transaction, he lacks the deceptive intent necessary for a finding of fraud.
 
 
 12
 We conclude that the evidence on which the plaintiffs rely does not support an inference that NAC intended to defraud them. Initially, our review of the evidence does not reveal any proof that the principals of NAC knew the company was insolvent when they met on September 12. The attorney Sacks testified that the people at the meeting primarily were concerned about whether NAC could cover its trading losses on the commodities markets quickly enough to prevent a loss of credit in future trades. Thus it is not clear that the principals considered the company insolvent. Moreover, even if we assume that the principals were aware of NAC's insolvency and did not reveal it, we cannot infer an intent not to complete subsequent commodities transactions from that fact alone. See In re Paragon Securities Co., 589 F.2d at 1245. The plaintiffs also must show that when NAC accepted their orders, the company's managers did not believe in good faith that the company would survive. The record contains little support for such a conclusion. It reveals only that the NAC principals met to address the company's financial problems and decided to create the "Special Trust Account". The company closed its doors a week later. As was the court in Paragon Securities, we are unwilling to hold that the debtor here committed fraud as a matter of law by continuing to operate in the normal course of business prior to the time it decided to cease its operations. 589 F.2d at 1245. The fact that NAC adopted a plan to protect new customers in case the company failed does not, in itself, demonstrate that the principals believed the company could not meet its new obligations.
 
 
 13
 If anything, the evidence indicates that the people responsible for managing NAC acted in good faith. According to Weekly, the company comptroller, NAC's principals analogized their decision to a choice between blowing up a bridge and allowing those crossing the chasm to fall in, or allowing more people to try to cross even though "the bridge may crumble." The principals hoped that the shareholders would add new capital to the company to shore it up. Knowing that the future was uncertain, however, they also created the "Special Trust Account." The new customers' money was not used to pay existing debts, as might be expected if the company accepted it with no intention of completing the customers' orders.
 
 
 14
 Our decision is not controlled by authority permitting customers of a bankrupt securities or commodities broker to retrieve funds remitted at a time when the business operations of the broker had already ceased. In In re Vermont Real Estate Investment Trust, 25 B.R. 813 (Bky., D.Vermont 1982), a real estate investment trust in the business of selling securities received a check for a securities purchase the day after the trustees had ordered the suspension of all trading in the trust's securities. The bankruptcy court held that the customer who sent the check was entitled to a full refund on a constructive trust theory. Similarly, in In re Bengal Trading Corp., 12 B.R. 695 (Bky., S.D.Fla.1981), the debtor was a commodities futures commission merchant who accepted funds for a securities purchase at a time when he could no longer legally trade in commodities futures because he did not meet the federal minimum financial requirements. Here too, the court held that the funds should be returned in full to the customer. Neither of these cases expressly relied on a fraud rationale, but they can be explained by the fact that the brokers involved either could not legally complete a requested transaction or clearly had no intention of doing so. In the instant case, by contrast, the customers who brought suit gave their funds to NAC at a time when the company was still conducting its business, albeit from a precarious position. As we have discussed, we cannot conclude from the circumstances surrounding NAC's operations that the company did not intend to complete the plaintiffs' transactions. Indeed, the company clearly intended that if a new infusion of capital had occurred, plaintiffs' funds would have been put to the use for which they were remitted.
 
 
 15
 Plaintiffs' final contention is that, even if the circumstances do not amount to actual fraud, we should impose a constructive trust on the ground that plaintiffs' funds were obtained by "means which render it unconscionable for the holder of legal title to retain and enjoy its beneficial interest." In re Estate of Rose, 108 Ariz. at 104, 493 P.2d at 115. For reasons of federal bankruptcy policy to which we have already referred, we are reluctant so to exercise a general equitable power in the circumstances here presented. We fully recognize that plaintiffs have sustained substantial losses as a result of the NAC bankruptcy. Plaintiffs, however, comprise only one of several comparable groups of creditors who sustained substantial losses. Plaintiffs happened to place their orders during the week of September 13, with the result that their funds were placed in a "trust" account (even though it was contemplated that the funds might later be removed to complete the transactions). Another group of customers placed their orders shortly before September 13, but sent in their purchase money during the week of September 13. Their funds were not placed in a special account, and they must look to the bankruptcy proceeding for their relief. Other customers both placed their orders and sent in their funds prior to September 13, but their orders had not been executed at the time of the bankruptcy. They, too, are treated as general creditors in the bankruptcy. We fail to discern the equitable principle that requires us to protect the plaintiffs' investments fully, at the expense of these other creditors. Indeed, the equities, as well as the principles underlying the bankruptcy laws, point in the other direction.
 
 
 16
 AFFIRMED.
 
 
 
 [1]
 Apparently none of these men was an officer or stockholder of NAC. David Weekly, the NAC comptroller, was the only one of the five who was a company employee. Three others were independent contractors; the fifth was an attorney who had handled some matters for the company but was not its general counsel. The fact that none of the actors was an officer or stockholder does not affect our analysis of this case, however, because the plaintiffs' claim is based on the alleged inequitable conduct of the company itself. Moreover, the company president accepted the course of action on which those at the meeting agreed
 
 
 [2]
 Indeed, a promise to create a trust for the benefit of certain creditors would probably be treated as a voidable preference under the Bankruptcy Code. No argument has been made in this case that the "Special Trust Account" creates an express trust for the benefit of the persons whose funds were placed in the account. Although the NAC principals may have intended that the plaintiffs would get their investments back if the company failed, that fact is irrelevant to the disbursement of the funds in bankruptcy