765 P.2d 550

**PIONEER ANNUITY LIFE INSURANCE COMPANY, an Arizona corporation, by S. David CHILDERS, Director of Insurance and Receiver, and Roy E. Gill, Deputy Receiver for Pioneer Annuity Life Insurance Company, Petitioners-Appellees,**

v.

**NATIONAL EQUITY LIFE INSURANCE COMPANY, and Vincente B. Jasso, its Receiver, Respondents-Appellants.**

No. 1 CA-CIV 9662.

Court of Appeals of Arizona, Division 1, Department D.

July 19, 1988.

Review Denied Jan. 10, 1989.

Nicholas C. Guttilla, Phoenix, for petitioners-appellees.

Robert K. Corbin, Atty. Gen. by Michael R. Schaffert, and Sara Begley Morrissey, Asst. Attys. Gen., Phoenix, for petitioner-appellee State Dept. of Ins.

Fennemore Craig by Timothy Berg, James J. Trimble, Phoenix, for respondents-appellants.

## OPINION

RICHARD M. DAVIS, Judge Pro Tem.*.

We are required here to resolve in a summary judgment context a dispute between the receivers of two insolvent insurance companies which were part of an insurance holding company system. Two matters are in issue in this proceeding pursuant to the uniform insurers liquidation act, the elements of which are specified in A.R.S. § 20–631. In the first, the appellant receiver for the subsidiary contends that the traceable proceeds of $1,200,000 paid to the appellee parent holding company ostensibly for reinsurance and used by the parent to purchase another subsidiary should be subject to a constructive trust in his favor. In the second controversy, the appellant receiver contends that an instrument purporting to be a mortgage executed by appellee's president should be enforced against the parent. We will deal with the two matters separately, viewing the facts as we must, in the light most favorable to appellant's positions. *Wagenseller v. Scottsdale Memorial Hosp.*, 147 Ariz. 370, 710 P.2d 1025 (1985).

---

* Richard M. Davis was authorized to participate in this case by the Chief Justice of the Arizona Supreme Court pursuant to Ariz. Const. Art. VI, § 3 and A.R.S. §§ 12–145 to –147.

## THE COLORADO LIFE PROCEEDS

### (Petition 9)

The appellee Pioneer Annuity Life Insurance Company (Pioneer), an Arizona corporation, is the holding company. Jack Rich owned all of the stock of Pioneer. In February, 1982, Pioneer acquired 96% of the stock of National Equity Life Insurance Company (NELIC), a New Mexico corporation. Ralph Hicks, NELIC's president, owned the remaining 4%. After Pioneer acquired NELIC, Jack Rich, two other Pioneer officers and directors, and Ralph Hicks constituted NELIC's board of directors.

In October, 1982, Pioneer set about to acquire substantially all of the stock of Colorado Life Insurance Co. (Colorado Life), for $1,200,000. At about the same time, Pioneer and NELIC entered into a reinsurance agreement, whereby NELIC as the ceding company paid to Pioneer a $1,200,000 premium and Pioneer as the assuming or reinsuring company[1] agreed to pay to NELIC 34.1673% of certain claims paid by NELIC on its single premium annuity contracts. Pioneer also agreed to pay to NELIC $175,000 as a commission allowance, to make certain other contingent payments, and to establish a reserve to meet its reinsurance obligations. The $1,200,000 paid by NELIC to Pioneer was ultimately used to purchase the Colorado Life stock.

The reinsurance or "coinsurance" agreement between NELIC and Pioneer was to all appearances a regular and standard form of agreement of a kind that is increasingly common in the industry. It was signed by Ralph Hicks for NELIC. Both companies had a number of other ceding or assuming reinsurance agreements with other companies.

NELIC's receiver alleges in this litigation, however, that Pioneer engaged in a pattern of "looting" NELIC, and that this particular reinsurance agreement was simply a disguised means by which Pioneer

depleted NELIC to obtain the money to acquire another subsidiary. Two other alleged instances of looting or attempted looting are cited in the affidavits submitted by NELIC. In one, Pioneer and Jack Rich in 1982 sold to NELIC's Oasis Leasing subsidiary a quantity of furniture for approximately $515,000 cash. The indicated liquidation value of the furniture in 1986 was only about $63,000. In the other, in 1984, all NELIC directors except Ralph Hicks agreed to waive notice of a meeting at which they voted to forgive an indebtedness of Pioneer to NELIC in the amount of approximately $260,000. Hicks would not sign the waiver of notice because, as he stated in an affidavit, there was no consideration flowing to NELIC in exchange for forgiving the Pioneer indebtedness.

Pioneer defaulted on its reinsurance agreement obligations to NELIC, and both companies were placed in receivership in 1985—Pioneer in Arizona and NELIC in New Mexico. In his petition No. 9, Pioneer's receiver asked for permission to sell the Colorado Life stock as a part of the process of liquidating Pioneer. NELIC's New Mexico receiver petitioned the court to impose a constructive trust on the stock or its proceeds for the benefit of the NELIC receivership. The trial court permitted sale of the stock for $950,000, deferring resolution of NELIC's claim. It ultimately granted Pioneer's motion for summary judgment on NELIC's claim on the theory that NELIC's $1,200,000 reinsurance premium became part of Pioneer's general funds and was usable for any legitimate purpose, including the Colorado Life acquisition.

NELIC's receiver[2] contends on appeal that he raised an issue of fact as to whether Rich and his Pioneer associates on the NELIC board breached their fiduciary duties to NELIC, including NELIC's creditor-policyholders and contractholders, so as to entitle NELIC's receiver to the imposition of a constructive trust of the Colorado

---

1. For discussion and authorities on the growing practice of reinsurance, see *State ex rel. Low v. Imperial Ins. Co.,* 140 Ariz. 426, 427–28, 682 P.2d 431, 432–33 (App.1984).

2. We will sometimes hereafter refer to both NELIC and its receiver as NELIC and to both Pioneer and its receiver as Pioneer.

Life proceeds. NELIC's position, more explicitly articulated on appeal than in the trial court, is that Rich and Pioneer dictated the reinsurance agreement to NELIC but never intended to perform its obligations to NELIC thereunder. NELIC has downplayed on appeal an argument advanced in the trial court that Pioneer's duty to create a reserve resulted in the creation of an express trust.

Pioneer's receiver takes the basic view that NELIC is a general as opposed to a priority creditor and advances a series of reasons why in his view a trust should not be imposed. He contends that this was a standard reinsurance agreement, the effect of which was correctly determined by the trial judge; that there was no express trust, as was urged more strenuously by NELIC in the trial court; that the comprehensive liquidation scheme of the uniform insurers liquidation act has supplanted the common law and does not allow for the creation of flexible, inchoate, "super priority" remedies such as a constructive trust; that there was no relevant fiduciary duty or cognizable breach of any such duty by Pioneer; and that apart from any of the foregoing, the rights of the parties became fixed, pursuant to A.R.S. § 20–635, on May 8, 1985, when Pioneer was placed in receivership. While we agree with a number of the general principles advanced by Pioneer's receiver, or aspects thereof, we conclude that none of them should bar NELIC from an opportunity to attempt to prove its allegations, which in our view certainly encompass unjust enrichment and at least approach the realm of actually fraudulent conduct.

We will first state our points of agreement with appellee.

■ We agree with appellee and the trial judge that Pioneer's duty to establish a reserve to meet its reinsurance obligations did not create an express trust consisting of the Colorado Life stock. While generalities about the nature of "reserves" are difficult, since their characteristics may vary with relevant industry norms and particularized accounting and legal considerations, the norm in the insurance industry is

that premiums, including reinsurance premiums, become part of the general assets of the insurer. We quote from Mowbray and Blanchard, *Insurance* 394 (5th Edition, 1961):

> *Reserves and Assets.* Since reserves constitute by far the largest part of the liabilities of an insurer, it follows that they are the principal determinant of the amount of assets that the insurer must have in order to remain solvent. But there is no "reserve fund" held to meet the obligations measured by the total reserves or those measured by any particular reserve. *The total assets of the insurer are available without division to meet the total liabilities.*

(Emphasis added.)

We find nothing in the Pioneer–NELIC agreement to an opposing effect. This conclusion does not, however, negate appellant's basic charge, which is essentially that the agreement was entered into on a *pro forma* basis, without realistic intention to perform, to provide funds for the Colorado Life purchase.

■ We also agree with appellee that generally speaking a party to a reinsurance contract is not entitled to secured or priority creditor status under the uniform insurers liquidation act. The reason is that these and similar laws were designed primarily for the protection of individual insurance consumers—individual insureds and their beneficiaries. *Foremost Life Ins. Co. v. Department of Insurance*, 274 Ind. 181, 409 N.E.2d 1092 (1980); *State v. Arizona Pension Planning*, 154 Ariz. 56, 59, 739 P.2d 1373, 1376 (1987).

■ Nor, we agree, is the creation of common law or equitable priorities, or "super priorities," generally favored in liquidation proceedings. *See State ex rel. Low v. Imperial Ins. Co.*, 140 Ariz. 426, 682 P.2d 431 (App.1984). This same view also finds expression and application in the bankruptcy cases. *See In re North American Coin & Currency, Ltd.*, 767 F.2d 1573 (9th Cir.1985) where a constructive trust was sought and denied.

Giving full effect to the principles of Rule 56, Arizona Rules of Civil Procedure, however, these points do not, in our view, go far enough to justify summary judgment.

Appellant alleges a clear conflict of interest. Rich and Pioneer controlled NELIC. They were in a position to have NELIC do their bidding. The courts have always given close scrutiny to contracts between corporations with common officers and directors. *Tucson Federal Savings & Loan Ass'n v. Aetna Investment Corp.*, 74 Ariz. 163, 172, 245 P.2d 423, 432 (1952); *Annot.*, 33 A.L.R.2d 1061 (1954).

■ As controlling shareholder, Pioneer and its officers on the NELIC board owed NELIC and its cognizable communities of interest a fiduciary duty to act fairly. *Washington National Trust Co. v. W.M. Dary Co.*, 116 Ariz. 171, 174, 568 P.2d 1069, 1072 (1977); *Steinfeld v. Copper State Mining Co.*, 37 Ariz. 151, 163, 290 P. 155, 160 (1930).

■ In our opinion, that fiduciary duty was owed to the policyholders and contract-holders of NELIC. There is no need for us at this stage in this litigation to consider whether Hicks was only a breaching obligor or to some extent an obligee in respect to fiduciary duties, or whether we must fully embrace the generality that corporate fiduciary duties generally are always owed to all corporate creditors. *See, e.g., Pepper v. Litton*, 308 U.S. 295, 306–07, 60 S.Ct. 238, 245, 84 L.Ed. 281, 288 (1939) and *W.H. Elliott & Sons Co. v. Gotthardt*, 305 F.2d 544 (1st Cir.1962). The functional reason for existence of an insurance company is to enter into contracts with people by which they are assured that funds will be available in the future. If an insurer's directors permit diversion of the insurer's assets to pursue objectives inconsistent with at least the maintenance of corporate ability, we have no difficulty in stating that their actions are in breach of fiduciary duty to policyholders.

■ The shoes which appellant's receiver wears are large enough to include vindication of the creditors' interest. We quote from *State v. Arizona Pension Planning*, 154 Ariz. at 60, 739 P.2d at 1377:

As receiver the Director has authority to recover Common Market's property for the benefit of its creditors including its insured. 19A J. Appleman, *supra* § 10692, at 131–38; 2A M. Rhodes, Couch on Insurance § 22:44, at 624 (rev. ed. 1984). If he is seeking to recover the insurer's assets, the Director may step into the insureds' shoes and assert the insureds' rights. 2A M. Rhodes, *supra* § 22:44; 3 R. Clark, A Treatise on the Law and Practice of Receivers § 765 (3d ed. 1959).

■ The imposition of a constructive trust *may be* an appropriate remedy for a breach of fiduciary duty. *L.M. White Contracting Co. v. Tucson Rock & Sand Co.*, 11 Ariz.App. 540, 544–546, 466 P.2d 413, 417–419 (1970); and *see generally* Bogert, *Trusts and Trustees* (Revised Second Ed. 1978), § 481. Where a fiduciary obtains property or money by means of an agreement or promise which he does not realistically intend to perform, a constructive trust may be imposed. *See generally* Am. Jur.2d, *Trusts*, § 224, and Bogert, *Trusts and Trustees, supra*, § 471.

■ In respect to legislative intent, appellee first argues that the insurers liquidation act is entirely comprehensive legislation which supplants and excludes within its sphere of operation the common law and traditional equitable remedies such as a constructive trust. In appellee's view, permissible secured claims or similar priorities are exhaustively enumerated in A.R.S. §§ 20–611(11) and 20–629. We disagree with these conclusions. In our opinion, the insurers liquidation act is comprehensive, but it is also designed to embrace and to be applied harmoniously with consistent common law and equitable concepts. We believe the "or otherwise" language in § 20–611(11) is broad enough to encompass a constructive trust.

Appellee also argues that we should not construe the insurers liquidation act to so readily accommodate a remedy for fraud or breach of trust. He raises the spectre of pleading abuses in the future. This was

not an arms-length transaction. The facts of this case being what they are, we do not share appellee's apprehension.

■ It should be noted that while the insurers liquidation act is generally and understandably designed to favor individual insureds and consumers over reinsurers and reinsureds, *see Foremost, supra,* the decision we make here is not at cross purposes with that design. NELIC is insolvent and its individual insureds have obviously been placed at risk.[3] If NELIC's allegations are proven, Pioneer's estate has been unjustly enriched at the expense of NELIC's. A constructive trust is designed to prevent unjust enrichment. *Burch & Cracchiolo v. Pugliani,* 144 Ariz. 281, 285, 697 P.2d 674, 678 (1985).

Both parties have taken comfort from *In re North American Coin & Currency, Ltd., supra.* The court there, determining a bankruptcy appeal from Arizona, suggested that actual fraud is a prerequisite to the imposition of a constructive trust. The court also emphasized the strong bankruptcy policy of rateable distribution. We take no exception to *In re North American Coin & Currency.* We believe this case as it is presently before us is close to actual fraud and that if appellant is able to prove his allegations, imposition of a constructive trust is appropriate.

Appellee's last argument is based upon A.R.S. § 20–635, which reads as follows:

The rights and liabilities of the insurer and of its creditors, policyholders, stockholders, members, subscribers and all other persons interested in its estate shall, unless otherwise directed by the court, be fixed as of the date on which the order directing the liquidation of the insurer is filed in the office of the clerk of the court which made the order, subject to the provisions of this article with respect to the rights of claimants holding contingent claims.

■ Appellee is correct in that the *right* to a constructive trust is to be deemed fixed as of May 8, 1985. A constructive trust, however, relates back to the date of the wrong. *King v. Uhlmann,* 103 Ariz. 136, 437 P.2d 928 (1968).

■ In sum, we find that nothing in the insurers liquidation act precludes the imposition of a constructive trust or its accommodation as a prior-positioned remedy, and we find facts alleged and adequately supported in the present summary judgment posture which indicate a possibility that such a remedy may be appropriate. We stress "may," because notwithstanding the apparent propriety of such relief on the basis of the record before us, trial may produce facts which cast a different light.

The trial court's summary judgment on this issue is reversed.

## THE MORTGAGE

### (Petition 22)

In the spring of 1984 the Arizona Director of Insurance became apprehensive in regard to Pioneer's financial condition. Exercising his authority under A.R.S. § 20–169, he asked Pioneer to agree to refrain from taking any significant financial steps without his prior approval. Consequently, Pioneer addressed a letter to the Director on May 21, 1984, in which it stated that it would not, among other things, encumber any assets without the Director's prior consent. The letter was signed by Jack Rich.

In September of the same year the New Mexico Commissioner of Insurance was of the view that NELIC had suffered a capital impairment. He also determined that an asset in the form of a $482,525 indebtedness of Pioneer to NELIC could not be considered an admitted asset of NELIC's for regulatory evaluation purposes. As a condition of NELIC remaining in business,

---

**3.** The Arizona Life Disability Guaranty Fund and the New Mexico Life Insurance Guaranty Fund are parties in the proceedings in the superior court, aligned with the positions of their respective domiciliaries. Neither is a party to this appeal and we are not informed as to the extent of their present and anticipated liabilities from defaults by Pioneer and NELIC. None of the positions of the parties asserted here is based upon or related to consequences to the guarantors.

the Commissioner directed NELIC to deposit $500,000 in cash and securities and to obtain $600,000 in new capital. Pioneer was at the time engaged in negotiations to sell its Phoenix office building. On September 28, 1984, Jack Rich executed a mortgage in the stated amount of $500,000 on the property. NELIC is the indicated mortgagee and Ralph Hicks signed the instrument for the mortgagee. Rich's title as president of Pioneer is not shown at either his signature or in the acknowledgment. The blank calling for "description of obligation" on the mortgage instrument is not filled in.

The New Mexico Commissioner reacted favorably to Pioneer's mortgage, which was recorded on October 3, and permitted NELIC to remain in business. In view of Pioneer's continuing defaults, he ultimately demanded that Pioneer establish a schedule to pay off the mortgage. Pioneer did not respond, and not long thereafter, NELIC's authority to engage in business was terminated.

In the present receivership proceedings Pioneer's receiver sought a declaratory judgment that the office building could be sold free and clear of the NELIC mortgage. The building was ordered sold as if free and clear pending determination of Pioneer's petition 11 and NELIC's opposing claim that the mortgage was an effective lien entitled to priority under A.R.S. § 20–611(11). The trial judge subsequently granted Pioneer's motion for summary judgment, holding without further elaboration that the mortgage was "void."

Pioneer's receiver's first contention is that the mortgage was an ineffectual instrument because it did not explicitly or otherwise secure any indebtedness. Citing the affidavit of Pioneer's counsel who prepared the instrument, he contends that it was given to evidence a capital contribution to NELIC, and not to secure any debt. Ralph Hicks, on the other hand, provided an affidavit in which he states that the mortgage was given to secure Pioneer's $482,525 indebtedness to NELIC so that the NELIC receivable could be admitted as an asset.

We agree with appellee that a mortgage is meaningless without an underlying indebtedness. *Best Fertilizers of Arizona, Inc. v. Burns,* 116 Ariz. 492, 570 P.2d 179 (1977); *Merryweather v. Pendleton,* 90 Ariz. 219, 367 P.2d 251 (1961); *Weatherford v. Adams,* 31 Ariz. 187, 251 P. 453 (1926). Here, however, there was an existing indebtedness and sworn testimonial indication of an intent to secure it. Preexisting indebtedness will support the giving of a mortgage to secure its payment. *See Hackin v. Pioneer Plumbing Supply Co.,* 10 Ariz.App. 150, 457 P.2d 312 (1969); *McCallister v. Farmers Development Co.,* 40 N.M. 101, 55 P.2d 657, 660 (1936).

While some authority may be found to the effect that a mortgage must include a description of the secured obligation, 9 *Thompson on Real Property* § 4745 (Replacement Ed. 1958), such a rule makes no sense in a jurisdiction like Arizona where a deed absolute may be found to be a mortgage, and we agree with Professor Osborne that no description is necessary. *Osborne, Handbook on the Law of Mortgages* (2nd Ed. 1970), § 106.

A recorded mortgage is presumed to have been given to have operative effect. *Wixom v. Ingham,* 21 Ariz.App. 62, 65, 515 P.2d 606, 608 (1973). In spite of the affidavit of Pioneer's participating counsel, the present record does not negate a mortgage given with valid consideration.

Appellee's next contention is that the mortgage was illegal. One of the cases cited by appellee, *E & S. Insulation Co. of Arizona v. E.L. Jones Constr. Co.,* 121 Ariz. 468, 591 P.2d 560 (1979), states the relevant principles as follows:

> The test for determining whether such a contract is illegal and, therefore, unenforceable was set out in *Ruelas v. Ruelas,* 7 Ariz.App. 98, 436 P.2d 490 (1968) and again in *Mountain States Bolt, Nut & Screw Co. v. Best–Way Transportation,* 116 Ariz. 123, 568 P.2d 430 (App. 1977). Parties have the legal right to make whatever contracts they desire, provided only that the contract is not for

illegal purposes or against public policy. Generally, a contract which cannot be performed without violating applicable law is illegal and void. The rule, however, is not inflexible. The court must look to legislative intent to determine whether a contract contrary to law is void as against public policy. Thus, in *Mountain States Bolt, Nut & Screw Co. v. Best–Way Transportation*, this court said:

> If the acts to be performed under the contract are themselves illegal or contrary to public policy, or if the legislature has clearly demonstrated its intent to prohibit maintenance of a cause of action, then recovery should be denied.

(Citations omitted.)

The crux of appellee's contention is that giving effect to Pioneer's mortgage would violate public policy because it undercuts the authority of the Director of Insurance to regulate effectively. It should be observed in that regard that the Director had not at the time placed Pioneer in conservatorship, or even under what the parties have called "formal" supervision under §§ 20–169 and 20–170; the Director had merely elicited Pioneer's promise in an "informal" rehabilitation program.

■ As the passage from *E & S Insulation* indicates, the principles under which contracts will be voided for illegality do not reach so far. There is nothing illegal about giving or enforcing a mortgage. While Pioneer's act in giving the mortgage was flagrantly in violation of its solemn promise to the Director, it was otherwise lawful conduct. There is also no evidence in the present record that the New Mexico Commissioner knew the mortgage was given against the agreed restriction. *Compare* 42 Am.Jur.2d, "Injunction," § 338 (1969).

Analogy to the violation of an injunction is helpful. Generally, the remedy is confined to contempt, not invalidation of the transaction. *See Gallaway v. Smith*, 70 Ariz. 364, 370, 220 P.2d 857, 863 (1950), and 42 Am.Jur.2d, *Injunctions, supra.* We reject appellee's illegality argument.

Appellee's next argument is that the mortgage is not legally or sufficiently executed, in that Rich's title as a corporate officer does not appear either in the body of the mortgage or in the acknowledgment. The contention provides no basis for negating NELIC's claim, especially on summary judgment.

The evidence adduced at trial may disclose a partially disclosed principal, if Pioneer could be considered only partially disclosed at this stage. *See Krumtum v. Burr*, 15 Ariz.App. 214, 487 P.2d 435 (1971), and *Restatement (Second) of Agency*, § 4, (1958). The evidence at this stage, including that of Pioneer's counsel who prepared the mortgage, clearly indicates that this was the deliberate act of Pioneer.

■ An insufficiency in the acknowledgment may affect the validity of record notice to third parties, but it does not affect the rights between the parties and those who stand in their shoes. *Citizens National Bank in Zanesville v. Denison*, 165 Ohio St. 89, 133 N.E.2d 329 (1956); 55 Am.Jur.2d Mortgages, § 165 (1971).

In Arizona, it is also the established rule that an insufficiently executed mortgage may nevertheless be enforced between the parties as an equitable mortgage. *See* A.R.S. § 33–437 and *Heller v. Levine*, 7 Ariz.App. 231, 234–35, 437 P.2d 983, 986–87 (1968). Pioneer acknowledges *Heller*, but contends that even if the mortgage satisfies the equitable mortgage test, it should not be given priority under A.R.S. §§ 20–611(11) and 20–629 because of the explicitly defined priorities of the uniform insurers liquidation act. The argument largely echoes the argument in respect to the constructive trust.

■ We reject the argument here, too. We see valid reason for equitably enforcing this mortgage against Pioneer. The mortgage was given to induce the New Mexico state official to permit Pioneer's subsidiary to remain in business and to presumably incur further contractual responsibilities requiring additional acceptable assets. It would be inequitable if enforcement were denied. We, of course, decide nothing more than the rights as between NELIC

and Pioneer; the rights of others are not before us.

Pioneer's last argument is that since NELIC must or may have to resort to the doctrine of equitable enforcement to gain priority, its right to priority was not fixed as of May 8, 1985, under A.R.S. § 20-635. We agree with appellants' contention that A.R.S. § 20-635 "fixes the rights of creditors but does not erase them." NELIC had an enforceable equitable mortgage when the receivership began.

The summary judgment for appellee on the mortgage is also reversed.

Reversed and remanded.

GRANT, P.J., and CONTRERAS, J., concur.