### In re COMMERCIAL MONEY CENTER, INC., Debtor.

**Federal Deposit Insurance Corporation, Appellant,**

v.

**Richard M. Kipperman, Chapter Trustee, Appellee.**

**BAP No. SC–07–1298–DCMo.**

**Bankruptcy No. 02–09721.**

**Adversary No. 03–90331.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted on June 20, 2008.

Filed: Aug. 4, 2008.

Karen Dougan Vogel, Sheppard, Mullin, Richter & Hampton LLP, San Diego, CA, for Appellant.

Oscar Garza, Gibson, Dunn & Crutcher, LLP, Irvine, CA, for Appellee.

Before DUNN, CARROLL [2] and MONTALI, Bankruptcy Judges.

## OPINION

DUNN, Bankruptcy Judge.

The Federal Deposit Insurance Corporation ("FDIC"), as receiver for NetBank, FSB ("NetBank"),[3] appeals the bankruptcy

2. Hon. Peter H. Carroll, Bankruptcy Judge for the Central District of California, sitting by designation.

3. On September 28, 2007, the Office of Thrift Supervision closed NetBank and appointed

court's grant of summary judgment in favor of the chapter 7 trustee, avoiding Net-Bank's security interest in rights to future payments due under various leases ("lease payments") and in contract rights under the surety bonds guaranteeing the lease payments.[4] At issue in the appeal before us is whether NetBank perfected its security interests in the lease payments and the surety bonds so as to withstand the trustee's avoidance powers under §§ 544 and 547(b).

For the reasons set forth below, we AFFIRM.

## I. FACTS

### A. *Events Prior to the Bankruptcy*

The present appeal is the second appeal in the underlying adversary proceeding. Although we set forth substantial factual background in *NetBank, FSB v. Kipperman (In re Commercial Money Center, Inc.)*, 350 B.R. 465 (9th Cir. BAP 2006) (*"Commercial Money Center I"*), we reiterate certain pertinent facts here for convenience of reference.

#### 1. *Sale and Servicing Agreement between CMC and NetBank*

Commercial Money Center, Inc. ("CMC") engaged in the business of originating commercial equipment leases. CMC purchased equipment and leased it to consumer end-users with sub-prime credit. CMC then grouped these leases together into "lease pools" and assigned the lease payments (but not the leases themselves) to third-party investors. To enhance the marketability of the lease pools, CMC obtained surety bonds guaranteeing the lease payments and assigned its rights under the surety bonds to the investors.

Between March 18, 1999 and September 6, 2000, NetBank paid CMC approximately $47 million for seven lease pools.[5] With respect to each of the seven lease pools, CMC, NetBank and Amwest Surety Insurance Company ("Amwest") entered into a separate Sale and Servicing Agreement ("SSA").[6] Amwest initially issued the surety bonds, but its successor, Royal Indemnity Company ("Royal"), issued its own surety bonds to replace them.

Under the SSA, CMC assigned to Net-Bank its rights to and interests in the lease payments and its rights under the surety bonds, among other things (collectively, "transferred assets"). SSA, Article II, § 2.1(a)(i)-(iv). As security for the lease payments, CMC granted NetBank a security interest in a bundle of assets, including the leases themselves, the equipment, insurance policies, and all items contained in the lease files, and any other documents relating to the leases kept on file pursuant to CMC's customary procedures (collectively, "lease assets")—but not the surety bonds. SSA, Article II, § 2.1(b)(i).

the FDIC as receiver. Appellant's Opening Brief at 3. On November 1, 2007, we issued an order substituting the FDIC for NetBank as the appellant.

**4.** Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001–9036, as enacted and promulgated prior to the effective date (October 17, 2005) of most of the provisions of the Bank-

ruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. 109–8, April 20, 2005, 119 Stat. 23.

**5.** NetBank paid CMC a total of approximately $123 million for seventeen lease pools, but only seven lease pools were at issue in the underlying adversary proceeding.

**6.** Each SSA included in the record before us is identical.

At the time CMC assigned the transferred assets and granted the security interest in the lease assets to NetBank, CMC represented that all filings and other actions required to give NetBank a first priority perfected lien or ownership interest in the leases and the transferred assets had been accomplished, including filings of Uniform Commercial Code ("UCC") financing statements. SSA, Article II, § 2.4(n). CMC also agreed that it would take all actions necessary to maintain and/or preserve, in NetBank's favor, a first priority perfected security interest in the lease assets and the transferred assets. SSA, Article II, § 3.13(b)-(c); Article VI, § 6.5; Article X, § 10.2(a). Neither CMC nor NetBank filed any UCC financing statements with respect to the lease assets or the transferred assets.

Pursuant to the SSA, Royal was appointed as servicer, and CMC was appointed as sub-servicer. SSA, Article I, § 1.1.

As sub-servicer, CMC assumed all responsibility, as agent for and on behalf of the servicer, to perform the servicer's duties under the SSA, although the servicer was not relieved of any of its obligations under the SSA. SSA, Article I, § 1.1; Article III, § 3.7. NetBank agreed to deal directly with CMC for as long as it served as sub-servicer. SSA, Article III, § 3.7. CMC later formed Commercial Servicing Corporation ("CSC") to service the lease pools. CSC was a wholly-owned subsidiary of CMC.

The servicer and/or sub-servicer acted as NetBank's agent. SSA, Article II, § 2.2(a); Article III, § 3.1. As agent, the servicer and/or sub-servicer was to manage the leases and collect and distribute the lease payments, among other things.

SSA, Article III, § 3.1; Article III, § 3.2(a).

The servicer and/or sub-servicer also acted as NetBank's custodian of documents and instruments relating to the leases. SSA, Article II, § 2.2(a). Specifically, the servicer and/or sub-servicer was to be in possession and maintain custody of the original leases, all documents relating to the leases and copies of all of the surety bonds, among other things. SSA, Article II, § 2.2(a)(i)-(iv); Article II, § 2.2(c)(i)-(iii). CMC was to hold and maintain the lease files in its offices in Escondido, California. SSA, Article II, § 2.2(b). Royal agreed to deliver the original lease files to CMC as sub-servicer, though CMC was to deliver the original surety bonds to NetBank. SSA, Article II, § 2.7(a)-(b).

CMC retained physical possession of the lease files at its offices. NetBank actually had physical possession of the surety bonds.

## 2. *District Court proceedings*

In late 2001 and early 2002, CMC failed to distribute the payments owed to NetBank under the SSAs. NetBank demanded compensation from Royal as surety for the defaulted payments; Royal complied.

On February 1, 2002, Royal initiated an action against CMC in the United States District Court for the Southern District of California ("District Court Action"),[7] seeking to freeze certain bank accounts of CMC, remove CMC as sub-servicer and obtain an order requiring CMC to provide an accounting of the books and financial records of the Royal bonded leases.

On the same day, Royal obtained a temporary restraining order ("TRO") against CMC, requiring CMC to "make available

---

**7.** The District Court Action later was transferred to the United States District Court for the Northern District of Ohio and consolidated with other lawsuits initiated by various sureties and third-party investors against CMC.

to Royal all books, records, and accounts related to Royal bonded leases." CMC also was prohibited from withdrawing or transferring any Royal bonded lease payments.

Between February 11, 2002 and March 26, 2002, Royal and CMC stipulated to several amendments to the TRO,[8] all of which required CMC to "make reasonably available" to Royal, beginning on February 6, 2002, all books, records and accounts related to Royal's bonded leases. Royal initially did not seek possession of the lease files, but rather access to them.

The amendments to the TRO further prohibited CMC from: (1) withdrawing any lease payments from certain accounts related to the Royal bonded lease pools; (2) removing any leases from Royal bonded lease pools without Royal's consent; (3) depositing any Royal bonded lease payments into accounts other than those related to the Royal bonded lease pools; (4) instructing lessees in the Royal bonded lease pools to deposit or transfer lease payments into bank accounts other than those related to Royal; (5) depositing any proceeds from any collection activities related to any Royal bonded leases into bank accounts other than those related to Royal; (6) transferring any payments from leases that had been removed from the Royal bonded lease pools ("removed leases") and placed into non-Royal accounts; and (7) selling or transferring any of the removed leases or any payments derived from the removed leases without Royal's consent.

On February 26, 2002, the magistrate judge in the District Court Action entered an order requiring CMC to produce an electronic copy of all lease accounting data maintained by CMC with respect to the Royal bonded leases by March 4, 2002 ("February 26 order"). CMC also was required to produce or provide access to "the removed lease files bonded by the respective sureties" by March 6, 2002. On March 4, 2002, CMC provided compact discs containing lease accounting data and copies of some electronic files to counsel for Royal.

On March 8, 2002, counsel for CMC directed Royal and the other sureties by letter to retrieve their respective lease files from CMC's offices on March 11, 2002. When James Patterson, counsel for Royal, arrived at CMC's offices, the offices were vacated and closed. On the same day, by a faxed letter, counsel for CMC informed Royal and the other sureties that the lease files would be available for retrieval the next day. Mr. Patterson retrieved the lease files on March 12, 2002.[9]

On March 19, 2002, the district court approved a stipulation between CMC, Royal and the other sureties ("March 19 stipulation")[10] whereby CMC resigned as subservicer. CMC also would make available for retrieval by Royal, beginning March 12, 2002, all of the original files related to its bonded leases. CMC was obligated to make all of the lease files available to Royal until it was able to inventory the

8. The District Court entered a total of four stipulated amendments to the TRO. The first stipulation was entered on February 11, 2002. The second stipulation was entered on February 13, 2002. The third stipulation was entered on March 5, 2002. The fourth stipulation was entered on March 26, 2002.

9. Although Mr. Patterson has asserted in various declarations that he retrieved the lease files from CMC's offices on March 12, 2002,

in the reply declaration in support of an order to show cause regarding contempt, he asserted that he retrieved the lease files on March 11, 2002. The bankruptcy court explicitly found, however, that it was "undisputed that Royal did not obtain actual possession of the leases until March 12, 2002."

10. The stipulation superseded the TRO. 8

files and verify that CMC indeed had made available all the necessary files. CMC further agreed to preserve and maintain and make reasonably available to Royal, for inspection and copying, all documents and records not previously made available to Royal, "however stored or maintained and wherever located, now in [CMC's] possession or under [its] control related to the business or activities of CMC/CSC."

## B. *Context of the Present Appeal*

### 1. *The prior appeal*

On May 30, 2002, CMC filed a voluntary chapter 11 petition,[11] which case later was converted to chapter 7 on July 12, 2002.[12]

11. Approximately two weeks later, CSC filed its own voluntary chapter 11 petition.

12. CMC filed its chapter 11 petition in the United States Bankruptcy Court for the Southern District of Florida. The case was transferred to the United States Bankruptcy Court for the Southern District of California on September 18, 2002.

13. In his complaint, the trustee asserted numerous claims for relief, of which only the following appeared to be at issue in the Partial Summary Judgment Motions: (1) Declaratory Relief that Transactions Involving CMC–N Purportedly Transferred Assets and CMC–N Collateral Did Not Constitute a "True Sale" and that NetBank Did Not Perfect Any Interest Therein—11 U.S.C. § 541 and F.R.B.P. 7001(9); (2) Alternative Declaratory Relief that Even If Transactions Involving CMC–N Purportedly Transferred Assets and CMC–N Collateral Constituted a "True Sale," For Such Sale to Be Effective, NetBank Was Required to, But Did Not, Perfect Its Interest Therein—11 U.S.C. § 541 and F.R.B.P. 7001(9); (3) Order Directing NetBank to Turn Over Estate Assets—11 U.S.C. §[§ ] 542, 550 and 551; (5) Judgment Voiding 90–Day Preferential Transfer—11 U.S.C. § 547; (6) Judgment Avoiding Unperfected Interests in CMC–N Purportedly Transferred Assets and CMC–N Collateral—11 U.S.C. §§ 544 and 551; (7) Recovery of Avoidable Transfers—11 U.S.C. § 550; and (10) Avoidance and Recovery of

More than a year after the petition date, the trustee commenced an adversary proceeding against NetBank.[13] The trustee sought declaratory relief characterizing the transfers of the lease assets and transferred assets as secured loans, rather than true sales, and determining that NetBank did not perfect its interests therein. Assuming that NetBank perfected its security interest by taking possession of the lease assets and transferred assets pursuant to the March 19 stipulation, the trustee sought to avoid the transfers as preferential pursuant to § 547(b).[14] With respect to any unperfected security interests in the lease assets or transferred assets, the trustee sought to avoid the transfers using his strong-arm powers pursuant to §§ 544 and 551.[15]

Unauthorized Postpetition Transfers—11 U.S.C. §§ 549 and 550.

14. Section 547(b) provides:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
(A) on or within 90 days before the date of the filing of the petition; or
(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if—
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

15. Section 544(a) provides:

The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any

NetBank filed a motion for partial summary judgment, to which the trustee filed a cross-motion (collectively, "Partial Summary Judgment Motions"). In its motion for partial summary judgment, NetBank asserted that, contrary to the trustee's argument, the transfers of the lease payments under the SSAs were true sales.

NetBank further contended that it held a perfected security interest in both the lease payments and the surety bonds. According to NetBank, the lease payments were payment intangibles within the meaning of Nevada Revised Statutes ("N.R.S.") § 104.9102.[16] Pursuant to N.R.S. § 104.9309, a security interest in a payment intangible automatically perfects upon sale.[17] As its security interest in the lease payments was automatically perfected upon sale, NetBank argued, the trustee could not avoid it.

NetBank contended that the sale of the lease payments also perfected its security interest in the surety bonds. NetBank characterized the surety bonds as supporting obligations for the lease payments. Under N.R.S. § 104.9308(4), perfection of a security interest in subject collateral also perfects a security interest in the supporting obligation for the collateral. Because its security interest in the lease payments was automatically perfected upon sale, NetBank contended its security interest in the surety bonds also was perfected.

In his cross-motion, the trustee disagreed with NetBank's characterization of the transfers as true sales, but agreed with NetBank's characterization of the surety bonds as supporting obligations.

After a hearing on December 20, 2004, the bankruptcy court issued a memorandum decision in favor of the trustee. Analyzing the relevant statutes, official commentary and case law, the bankruptcy court found that the lease payments constituted chattel paper. As such, NetBank

---

transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

(2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or

(3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

Section 551 provides:

Any transfer avoided under section 522, 544, 545, 547, 548, 549, or 724(a) of this title, or any lien void under section 506(d) of this title, is preserved for the benefit of the estate but only with respect to property of the estate.

16. Article X, § 10.3 of the SSA provided for the application of Nevada law.

"'Payment intangible' means a general intangible under which the account debtor's principal obligation is a monetary obligation." N.R.S. § 104.9102(1)(hhh) (2005).

"'General intangible' means any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas or other minerals before extraction. The term includes payment intangibles and software." N.R.S. § 104.9102(1)(pp) (2005).

17. N.R.S. § 104.9309 provides:

"The following security interests are perfected when they attach:

. . .

3. A sale of a payment intangible. . . ."

had to perfect its security interest in the lease payments by filing a financing statement, which NetBank did not do. The bankruptcy court did not expressly determine whether NetBank perfected its security interest in the surety bonds.

The bankruptcy court also went on to find that, upon examining the "four corners of the SSA," the transfers were secured loans, rather than true sales.

On February 28, 2005, the bankruptcy court entered its order, granting the trustee's cross-motion for partial summary judgment ("Partial Summary Judgment Order") in its entirety. On May 20, 2005, the bankruptcy court entered final judgment as to certain claims for relief asserted by the trustee in his complaint.[18] NetBank appealed the Partial Summary Judgment Order.

On appeal, in a published opinion, we affirmed in part and reversed in part.[19] *Commercial Money Center I*, 350 B.R. at 469.

We agreed with the bankruptcy court that the transfers of the lease assets and the transferred assets under the SSAs constituted secured loans, not true sales, as they "[bore] far more hallmarks of a loan than a sale." *Id.* at 483.

We disagreed with the bankruptcy court's characterization of the lease pay-

ments as chattel paper, however. *Id.* at 469. Although the leases themselves were chattel paper, *id.*, based on our analysis of applicable Nevada law,[20] we determined that "[lease payments] stripped from the underlying leases are not records that evidence monetary obligations—they are monetary obligations." *Id.* at 476 (emphasis in original). As such, the lease payments were payment intangibles.

We determined that genuine issues of material fact and legal issues still remained as to whether NetBank could perfect its security interest in the lease payments by possession of the leases through an agent and whether NetBank in fact had possession thereby. *Id.* at 487–88. We thus remanded to the bankruptcy court for further determinations. *Id.* at 488.

### 2. *The present appeal*

On September 6, 2006, the bankruptcy court issued a notice of a hearing regarding the remand ("Remand Hearing"), setting the hearing for November 17, 2006. Notice of Hearing on Remand re: Appeal # 2, docket # 177. Four days before the Remand Hearing, the trustee filed a motion for summary judgment as to the issues remanded to the bankruptcy court in the prior appeal ("Summary Judgment Motion").[21] NetBank opposed.

---

**18.** According to the amended final judgment, the bankruptcy court entered partial summary judgment in favor of the trustee on the first, second, third, fifth and sixth claims for relief stated in his complaint. Amended Final Judgment Pursuant to Fed. R. Bankr.P. 7054(b), in Favor of Chapter 7 Trustee on the First, Second, Third, Fifth and Sixth Claims for Relief Stated in the Trustee's Complaint against Defendant NetBank, FSB, docket # 145.

**19.** The bankruptcy court had ruled on cross-motions for partial summary judgment and had made an express determination of finality

under Fed.R.Civ.P. 54(b) (incorporated by Rule 7054). *See* 350 B.R. at 473 & n. 5.

**20.** " 'Chattel paper' means a record or records that evidence both a monetary obligation and a security interest in or a lease of specific goods.... As used in this paragraph, 'monetary obligation' means a monetary obligation secured by the goods or owed under a lease of the goods...." N.R.S. § 104.9102(1)(k) (2005).

**21.** The trustee and NetBank did not provide a number of documents in the record on appeal. These documents were docketed and imaged by the bankruptcy court. We have

After the April 26, 2007 hearing on the Summary Judgment Motion, the bankruptcy court took the matter under submission. Thereafter, the bankruptcy court issued its memorandum decision, again in favor of the trustee.

The bankruptcy court first found that, as a matter of law, NetBank could perfect its security interest in the lease payments *only* by filing a financing statement. According to the bankruptcy court, N.R.S. § 104.9313(1) enumerated only certain kinds of property with respect to which a security interest can be perfected by possession; neither general intangibles nor payment intangibles were included.[22]

Even if NetBank could perfect its security interest by possession through Royal, the bankruptcy court continued, Royal itself did not take possession. Citing to *Commercial Money Center I*, 350 B.R. at 486, the bankruptcy court reasoned that NetBank, as the secured party, could not perfect its security interest in the lease payments by constructive possession where the debtor, CMC, had actual possession of the leases at all relevant times.

Examining the TRO and the amendments thereto, the bankruptcy court further determined that Royal did not have such possession of the leases as to provide sufficient notice that NetBank had a security interest in the lease payments. Moreover, the bankruptcy court found, the TRO and its amendments only provided Royal with access to the lease files; neither the TRO nor the amendments directed CMC to turn over the leases or otherwise grant Royal possession or control of the leases. The bankruptcy court noted that it was undisputed that Royal did not take actual possession of the leases until March 12, 2002, which fell within the 90–day preference period.[23]

For the first time, NetBank contended that some of the surety bonds were not supporting obligations, but instruments within the meaning of N.R.S. § 104.9102(1)(tt).[24] Because NetBank had actual possession of those surety bonds outside the preference period, NetBank argued that it held a perfected security interest in them.

The bankruptcy court applied the law of the case doctrine to determine this issue. The bankruptcy court pointed out that, in its partial summary judgment motion, NetBank argued that the surety bonds were supporting obligations with respect to the lease payments. Consequently, NetBank argued its security interests in both the

reviewed these documents on the bankruptcy court's electronic docket and take judicial notice of them. *See Atwood v. Chase Manhattan Mortgage Co. (In re Atwood)*, 293 B.R. 227, 233 n. 9 (9th Cir. BAP 2003).

**22.** "Except as otherwise provided in subsection 2, a secured party may perfect a security interest in tangible negotiable documents, goods, instruments, money or tangible chattel paper by taking possession of the collateral. A secured party may perfect a security interest in certificated securities by taking delivery of the certificated securities under [N.R.S.] 104.8301." N.R.S. § 104.9313(1) (2005).

**23.** As CMC filed its chapter 11 petition on May 30, 2002, the 90–day preference period began running on approximately March 1, 2002.

**24.** N.R.S. § 104.9102(1)(tt) provides:

"Instrument" means a negotiable instrument or any other writing that evidences a right to the payment of a monetary obligation, is not itself a security agreement or lease, and is of a type that in ordinary course of business is transferred by delivery with any necessary endorsement or assignment. The term does not include investment property, letters of credit or writings that evidence a right to payment arising out of the use of a credit or charge card or information contained on or for use with the card.

surety bonds and lease payments were automatically perfected on sale of the lease payments. In addition, in opposition to NetBank's partial summary judgment motion and in his cross-motion for partial summary judgment, the trustee agreed that the bonds were supporting obligations. Accordingly, when the Partial Summary Judgment Motions were argued before the bankruptcy court, *both* parties were asserting that the bonds were supporting obligations. The bankruptcy court believed it implicitly determined that the surety bonds were supporting obligations by finding that NetBank did not perfect its security interest in the lease payments and that the trustee was entitled to summary judgment avoiding NetBank's security interest in all of the transferred assets, including the surety bonds.

On July 2, 2007, the bankruptcy court entered an order granting the trustee's motion for summary judgment in its entirety ("Summary Judgment Order").[25] Order Granting Trustee's Motion for Summary Judgment, docket # 204. The following day, it entered final judgment in favor of the trustee as to the claims for relief encompassed in his Summary Judgment Motion.

The FDIC appeals.[26]

**25.** One month after the bankruptcy court entered the Summary Judgment Order, the trustee and NetBank agreed to dismiss the remaining claims for relief in the trustee's complaint. Pursuant to a global settlement agreement entered on May 31, 2005, the trustee and NetBank agreed to dismiss the Fourth, Ninth and Eleventh claims for relief without prejudice and to dismiss the Eighth and Tenth Claims for Relief with prejudice. The trustee also agreed to dismiss the Seventh Claim for relief without prejudice, as he believed that the Partial Summary Judgment Order rendered it moot. Stipulation to Dismiss Fourth, Seventh, Eighth, Ninth, Tenth, and Eleventh Claims for Relief Pursuant to

## II. JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(B) and (F). We have jurisdiction pursuant to 28 U.S.C. § 158.

## III. ISSUES

(1) Whether NetBank perfected its security interest in the lease payments.

(2) Whether the law of the case doctrine bars NetBank from arguing that the surety bonds are instruments, rather than supporting obligations.

(3) If not, whether the surety bonds are instruments.

## IV. STANDARDS FOR REVIEW

We review de novo the bankruptcy court's grant of summary judgment. *Balint v. Carson City,* 180 F.3d 1047, 1050 (9th Cir.1999). Viewing the evidence in the light most favorable to the non-moving party, we must determine whether any genuine issues of material fact exist, and whether the bankruptcy court correctly applied relevant substantive law. *Id.* We may neither "weigh the evidence [nor] determine the truth of the matter, but only determine[ ] whether there is a genuine issue for trial." *Id.* at 1054. "We may affirm a grant of summary judgment on

Federal Rule of Civil Procedure 41(a)(1), docket # 213.

The bankruptcy court entered an order granting the stipulation. Order Granting Stipulation to Dismiss Fourth, Seventh, Eighth, Ninth, Tenth and Eleventh Claims for Relief Pursuant to Federal Rule of Civil Procedure 41(a)(1), docket # 216.

**26.** As in the prior appeal, the trustee and NetBank stipulated to an extension of time to allow NetBank to appeal the Summary Judgment Order. Pursuant to an order on the stipulation to extend the deadline to appeal, NetBank had until August 2, 2007 to file its notice of appeal.

any ground supported by the record." *Simo v. Union of Needletrades,* 322 F.3d 602, 610 (9th Cir.2003).

Summary judgment may be appropriate when a mixed question of fact and law involves undisputed underlying facts. *Citicorp Real Estate, Inc. v. Smith,* 155 F.3d 1097, 1103 (9th Cir.1998). Summary judgment is inappropriate, however, if any material factual issues exist for trial. *Id.*

■ We review conclusions of law and questions of statutory interpretation de novo. *Abele v. Modern Fin. Plans Servs., Inc. (In re Cohen),* 300 F.3d 1097, 1101 (9th Cir.2002).

■ We review the bankruptcy court's application of the law of the case doctrine for an abuse of discretion. *Milgard Tempering, Inc. v. Selas Corp. of America,* 902 F.2d 703, 715 (9th Cir.1990).

■ Whether a writing is properly characterized as an instrument under the UCC is a question of law that we review de novo. *See Omega Envtl., Inc. v. Valley Bank NA (In re Omega Envtl., Inc.),* 219 F.3d 984, 986 n. 4 (9th Cir.2000) (per curiam).

## V. DISCUSSION

A. *NetBank's Security Interest in the Lease Payments*

The FDIC contends that the bankruptcy court erred in granting summary judgment in favor of the trustee because a security interest in lease payments can be perfected by possession of the underlying leases, as reasoned in *Gray v. Jefferson Loan & Inv. Bank (In re Commercial Management Serv., Inc.),* 127 B.R. 296 (Bankr.D.Mass.1991) (*"Commercial Management"*).

Arguably, NetBank could have perfected its security interest either by filing a financing statement or by possession of the leases, as decided in *Commercial Management.* Based on the record before us, however, NetBank did neither.

1. *No perfection by filing a financing statement*

The filing of a financing statement is "by far the most common and important method" by which to perfect a security interest. White & Summers, Uniform Commercial Code, § 31–4 (5th ed.2002). It is undisputed, however, that NetBank did not file any financing statements with respect to the transferred assets or the lease assets; in its answer to the trustee's complaint, NetBank conceded that it did not file any financing statements, and no financing statements were filed in its behalf, in either Nevada or California. NetBank thus did not perfect its security interest in either the transferred assets or the lease assets by filing.

2. *No perfection by possession*

Relying on the reasoning of *Commercial Management,* the FDIC argues that NetBank perfected its security interest in the lease payments by constructive possession of the leases through Royal, its third-party agent.

In *Commercial Management,* the bankruptcy court held that the assignee, Jefferson Loan and Investment Bank ("Jefferson") perfected its security interest in lease payments by taking physical possession of the underlying leases, even though it did not file any financing statements as to the lease payments. 127 B.R. at 304.

The bankruptcy court in *Commercial Management* acknowledged that pre-revision UCC § 9–305 did not specifically provide that the transfer of chattel paper transferred the underlying obligation, nor did it specifically provide that perfection of a security interest in the chattel paper by

possession perfected a security interest in the obligation. *Id.* at 302 (quoting Boss, *Lease Chattel Paper: Unitary Treatment of a "Special" Kind of Commercial Specialty,* 1983 Duke L.J. 69, 92 (1983)). The bankruptcy court believed, however, that possession of the chattel paper itself would be rendered meaningless unless the transfer of the chattel paper operated to transfer the rights embodied therein. *Commercial Management,* 127 B.R. at 302 (quoting Boss, 1983 Duke L.J. at 92–94).

We reviewed *Commercial Management* as part of our analysis in Commercial Money Center I. In light of certain provisions of the UCC and the reasoning of *Commercial Management,* we suggested that "a perfected interest in chattel paper [may] include[ ] the associated [lease payments]," possibly as proceeds. *Commercial Money Center I,* 350 B.R. at 479.

However, even if we determined that the holding of *Commercial Management* applied in the appeal before us, we conclude that NetBank did not effectually take possession of the leases through Roy-

al for perfection purposes outside of the preference period.

### a. *Royal did not have actual possession of the leases*

As one commentator has noted, "[p]ossession is a notoriously plastic idea." White & Sommers, Uniform Commercial Code, § 31–8(b) (5th ed.2002). Accordingly, the drafters of Article 9 of the UCC declined to define "possession." *Id. See also* UCC § 9–313 cmt. 3 (2007).

The Nevada version of UCC § 9–313 also does not define "possession."[27] *See* N.R.S. § 104.9313 (2005). Under N.R.S. § 104.9313(3), a secured party takes actual possession of chattel paper through an agent possessing the collateral in its behalf.[28] *See* N.R.S. § 104.9313(3) (2005); *see also* UCC § 9–313 cmt. 3 (2007). The commentary to UCC § 9–313 suggests that the agent cannot be the debtor, an agent of the debtor or any other person or entity "so closely connected to or controlled by the debtor that the debtor has retained effective possession. . . ."[29] UCC § 9–313 cmt. 3 (2007).

27. Nevada has adopted the UCC. *See Walker Bank & Trust Co. v. Smith,* 88 Nev. 502, 501 P.2d 639, 641 (1972). N.R.S. § 104.9313 mirrors UCC § 9–313, save for minor changes in numbering and wording. *Compare* N.R.S. § 104.9313 (2005) *with* UCC § 9–313 (2007).

28. N.R.S. § 104.9313 provides, in relevant part:

3. With respect to collateral other than certificated securities and goods covered by a document, a secured party takes possession of collateral in the possession of a person other than the debtor, the secured party or a lessee of the collateral from the debtor in the ordinary course of the debtor's business, when:
(a) The person in possession authenticates a record acknowledging that it holds possession of the collateral for the secured party's benefit; or
(b) The person takes possession of the collateral after having authenticated a record

acknowledging that it will hold possession of collateral for the secured party's benefit.

29. In its opposition to the Summary Judgment Motion, NetBank argued that it perfected its security interest in the lease payments by possession of the leases through CSC. According to the bankruptcy court, NetBank failed to present evidence to show that CSC was an agent for NetBank. Memorandum Decision, 11:24 n. 11. The bankruptcy court found that the SSAs provided that CMC would maintain possession of the leases. Memorandum Decision, 11:24–25 n. 11. Assuming that CSC did take possession of the leases, the bankruptcy court concluded, it was on behalf of CMC, the debtor. Memorandum Decision, 11:26–28 n. 11. Neither the trustee nor NetBank mention this issue in the appeal before us.

We agree with the bankruptcy court that NetBank cannot take possession of the leases through CSC because it is an affiliate and/or

Within the Ninth Circuit, the agent must have *actual* possession of the collateral in order for the secured party to have a perfected security interest pursuant to UCC § 9–313. *Heinicke*, 543 F.2d at 701–02; *Huffman v. Wikle (In re Staff Mortgage & Inv. Corp.)*, 550 F.2d 1228, 1230 (9th Cir.1977).[30] *See also Fogler v. Casa Grande Cotton Finance Co. (In re Allen)*, 134 B.R. 373, 376 n. 5 (9th Cir. BAP 1991). A secured party or its agent takes actual possession when the collateral is physically transferred to the secured party or its agent. *Raiton v. G & R Props. (In re Raiton)*, 139 B.R. 931, 936 (9th Cir. BAP 1992) (defining "possession" under former Cal. Com.Code § 9–305). By having the agent take actual possession of the collateral, notice is provided to prospective third-party creditors that the debtor " 'no longer has unfettered use of [the secured party's] collateral.' " *Heinicke*, 543 F.2d at 702 (quoting *In re Copeland*, 391 F.Supp. 134, 151 (D.Del.1975)); *Huffman*, 550 F.2d at 1230.

The leases were not physically transferred to Royal outside the preference period. According to the declarations of Mr. Patterson and William Hibberd, an actuary for Royal, Royal did not obtain physical possession of any of the original lease files until March 12, 2002. Given the uncontroverted declarations of Mr. Patterson and

Mr. Hibberd, the FDIC does not contest this point.

b. *The TRO and the amendments did not give Royal control of the leases*

The FDIC instead advances a two-pronged argument to establish that Net-Bank perfected its security interest in the lease payments by possession of the leases through Royal outside the preference period: (1) that Royal gained *control* over the leases through the TRO and the amendments thereto; and (2) that CMC held the leases in constructive trust for Royal.

The FDIC first argues that the TRO and its amendments provided Royal with sufficient control over the leases as to constitute possession. According to the FDIC, the TRO and the amendments "limited CMC's control over the [l]eases to such a degree" as to notify third-parties that CMC no longer had "unqualified 'possession' " of the leases and that Royal did. Appellant's Reply Brief at 7.

As the bankruptcy court pointed out, however, neither the TRO nor the amendments to it provided Royal with control of the leases. The TRO and the amendments only required CMC and/or CSC to "make available" to Royal all the books, records and accounts related to the leases. The other provisions of the TRO and its amendments simply prohibited and re-

---

wholly-owned subsidiary of CMC; CMC had formed CSC for the purpose of servicing the lease pools. *See* UCC § 9–313 cmt. 3 (2007) ("[A] person in possession [may be] so closely connected to or controlled by the debtor that the debtor has retained effective possession, even though the person may have agreed to take possession on behalf of the secured party."). *Cf. Heinicke Instruments Co. v. Republic Corp.*, 543 F.2d 700, 702 (9th Cir.1976) ("The notice function of U.C.C. § 9–305 [precursor to current UCC § 9–313] would be defeated if the debtor, or a person under the debtor's control, were left in possession of the collateral; therefore, perfection will not occur under those circumstances, even if the credi-

tor makes the debtor his agent or his bailee.").

30. *Heinicke* and *Huffman* deal with O.R.S. § 79.3050 and Cal. Com.Code § 9305, respectively, the Oregon and California versions of former UCC § 9–305, the predecessor of UCC § 9–313. *See* UCC § 9–313 cmt. 1 (2007) (former UCC § 9–305 is source of UCC § 9–313); *Heinicke*, 543 F.2d at 701 n. 1 (referring to UCC § 9–305 throughout the opinion to refer to O.R.S. § 79.3050); *Huffman*, 550 F.2d at 1229 (referring parenthetically to UCC § 9–305).

stricted CMC and/or CSC from removing the lease payments and the leases from Royal accounts and Royal bonded lease pools and from transferring the lease payments and leases to non-Royal entities and accounts. The TRO and its amendments did not by their terms enable Royal to exert or gain control over the leases, and thus provide the notice to third-party creditors that is the raison d'être for perfection requirements under the UCC. In fact, Royal was not specifically authorized "to retrieve" the leases and lease files by order of the district court until the March 19 stipulation.

The record also shows that Royal had no intention of obtaining physical possession or control of the leases through the TRO and its amendments. As indicated by Mr. Patterson in his deposition testimony on December 7, 2006, Royal was not seeking possession of the lease files at the time it applied for the TRO. Rather, Royal's objective "was to obtain access to this information." In a letter to counsel for CMC, dated March 26, 2002, drafted by Mr. Patterson, Royal only sought access to the lease files so that it could "conduct a proper audit of the lease files." The declaration of Mr. Hibberd in support of the TRO also demonstrates that Royal sought access to, not physical possession or control of, the leases.[31]

CMC was not required to make all of the lease files available to Royal for retrieval until CMC and Royal entered the March 19 stipulation. Unlike the March 19 stipulation, the TRO and its amendments did not mention retrieval. Notably, the March 19 stipulation made the date of Royal's retrieval of the lease files retroactive to March 12, 2002.

Based on the record before us, we conclude that Royal did not gain such control over the leases through the TRO and its amendments as to constitute actual possession outside the preference period. NetBank therefore did not take constructive possession of the leases, at least during any period relevant for purposes of this appeal.

c. *Royal did not have a constructive trust over the leases*

The FDIC argues in the alternative that Royal had possession of the leases because CMC held the leases in constructive trust for Royal when the TRO and its amendments divested CMC of control over the leases.

 We reject this argument. The FDIC, in effect, is using a back-door approach to establish perfection through possession by CMC. By arguing that CMC held the leases in constructive trust for Royal, the FDIC is attempting to characterize CMC as its agent indirectly.

As we explained in *Commercial Money Center I*, CMC cannot be the agent of NetBank for UCC Article 9 purposes, as a matter of law. *Commercial Money Center I*, 350 B.R. at 486–87. *See also Huffman*, 550 F.2d at 1230; *Heinicke*, 543 F.2d at 702. The debtor's lack of possession and the creditor's actual possession of collateral serve to notify third-party creditors that the debtor "no longer has unfettered use" of the collateral. *Heinicke*, 543 F.2d at 702. To conclude otherwise would defeat the notice function of perfection by possession under UCC § 9–313. *See id.*

---

**31.** The FDIC contends that the February 26 order also transferred control of the leases to Royal. Even assuming that the February 26 order was intended to transfer control sufficient to constitute possession (and we do not),

we note that CMC provided compact discs in response to the February 26 order on approximately March 4, 2002, which was within the preference period.

Even assuming that CMC could be an agent for purposes of perfection by possession, the FDIC cannot establish that a constructive trust should be imposed.

Property held in trust by the debtor for another generally is not property of the estate. *Torres v. Eastlick (In re N. Am. Coin & Currency, Ltd.)*, 767 F.2d 1573, 1575 (9th Cir.), *amended by* 774 F.2d 1390 (9th Cir.1985). We look to state law to determine whether a trust will be imposed on property in a bankruptcy proceeding. *Starr v. Bruce Farley Corp. (In re Bruce Farley Corp.)*, 612 F.2d 1197, 1200 (9th Cir.1980).

A constructive trust is a flexible, equitable remedy. *Airwork Corp. v. Markair Express, Inc. (In re Markair, Inc.)*, 172 B.R. 638, 642 (9th Cir. BAP 1994). Although property may be subject to a constructive trust under state law, it is not automatically excluded from the bankruptcy estate. *N. Am. Coin & Currency, Ltd.*, 767 F.2d at 1575. If there is no state court order imposing a constructive trust prepetition, then the right to such a remedy remains inchoate. *See Elliott v. Frontier Props. (In re Lewis W. Shurtleff, Inc.)*, 778 F.2d 1416, 1419 (9th Cir.1985). We therefore act very cautiously in recognizing a constructive trust in favor of one creditor over another, as one of the strongest policies in bankruptcy law is equality of distributions among like situated creditors. *N. Am. Coin & Currency, Ltd.*, 767 F.2d at 1575. Besides, "[b]ecause it is a *remedy*, a constructive trust cannot affect rights in the res until it is imposed." *Taylor Assocs. v. Diamant (In re Advent Mgmt. Corp.)*, 178 B.R. 480, 488 (9th Cir. BAP 1995) (emphasis in original). To date, no constructive trust has been imposed in favor of Royal or the FDIC on the leases.

In Nevada, a constructive trust arises when the holder of property is determined to be a trustee of that property for the benefit of another who in good conscience is entitled to it. *Locken v. Locken*, 98 Nev. 369, 650 P.2d 803, 804–05 (1982) (per curiam). Courts may impose a constructive trust where: (1) there is a confidential relationship between the parties; (2) it would be inequitable to allow the holder to retain the property; and (3) it is essential to the effectuation of justice to impose such a trust. *Id.* at 805. The party requesting the imposition of a constructive trust must prove these circumstances by clear and convincing evidence. *Randono v. Turk*, 86 Nev. 123, 466 P.2d 218, 222 (1970).

The FDIC claims that all of the circumstances for imposition of a constructive trust exist. We disagree.

With respect to the first factor, the FDIC has not shown by clear and convincing evidence that a confidential relationship existed between CMC and Royal. Under Nevada law, "[t]he essence of a ... confidential relationship is that the parties do not deal on equal terms." *Giles v. GMAC*, 494 F.3d 865, 881 (9th Cir.2007) (quoting *Hoopes v. Hammargren*, 102 Nev. 425, 725 P.2d 238, 242 (1986)) (internal quotation marks omitted). By virtue of the trust and confidence placed in and accepted by one party, that party is in such a superior position as to exert a "unique influence" over the dependent party. *Giles*, 494 F.3d at 881. A confidential relationship exists where " 'one party gains the confidence of the other and purports to act or advise with the other's interests in mind.' " *Id.* (quoting *Perry v. Jordan*, 111 Nev. 943, 900 P.2d 335, 338 (1995) (per curiam)).

The FDIC asserts that CMC had a confidential relationship with Royal because CMC was sub-servicer, as provided for in the SSAs. Nothing in the record indicates, however, that Royal had placed such trust

and confidence in CMC as to enable CMC to exert a "unique influence" over Royal. Under the SSAs, CMC was no more than an *agent* for Royal. CMC merely performed Royal's servicer duties by collecting the lease payments and distributing them to the third-party investors.

With respect to the second and third factors, we cannot agree with the FDIC that CMC's conduct, in light of the effects of the TRO and its amendments, was so inequitable as to require the imposition of a constructive trust. Clear and convincing evidence in the record does not mandate a constructive trust remedy.

 Moreover, as we pointed out in *Commercial Money Center I*, NetBank was a sophisticated commercial entity that should have acted further to protect its security interests. *Id.* at 486. The FDIC has not shown that NetBank was prevented from verifying whether CMC filed financing statements or from taking possession of the leases itself. It is inappropriate to impose a constructive trust where a commercially sophisticated creditor did not take reasonable steps to ensure that its security interests were perfected.

Based on the record before us, we conclude that the bankruptcy court did not err in finding that NetBank did not perfect its security interest in the lease payments by filing a financing statement or by taking possession of the leases through Royal. Because the FDIC failed to raise a genuine issue of material fact to support a finding of perfection of its security interest in the lease payments, outside of the preference period, the bankruptcy court properly granted summary judgment to the trustee avoiding the claimed security interest.

### B. *NetBank's Security Interest in the Surety Bonds*

The FDIC asserts that the bankruptcy court erred in granting summary judgment for the trustee because a genuine issue of material fact exists regarding the characterization of surety bonds as purely supporting obligations, or as instruments under the UCC.

The FDIC argues that the bankruptcy court applied the law of the case doctrine too broadly when it declined to consider the issue. The law of the case doctrine, the FDIC contends, only precludes the lower court from reconsidering issues decided either explicitly or by necessary implication by the higher court. No explicit or implicit finding was made in the prior appeal as to whether the surety bonds constituted instruments or supporting obligations. To the extent that the bankruptcy court implicitly determined that the surety bonds were supporting obligations, the FDIC adds, our partial reversal and remand in the prior appeal effectively "unmade" that determination. The bankruptcy court thus was free, the FDIC concludes, to address the issue on remand.

 We believe that the law of the case doctrine does not apply to the issue. Under the law of the case doctrine, a court is barred from reconsidering an issue that already has been decided in the same court or in a higher court in the same case. *Milgard Tempering, Inc. v. Selas Corp. of America*, 902 F.2d 703, 715 (9th Cir.1990). For the law of the case doctrine to apply, the issue must have been decided, either expressly or by necessary implication. *Id.* However, even if the law of the case doctrine applies, a court may decide, in its discretion, to revisit the issue if: "(1) the first decision was clearly erroneous and would result in manifest injustice; (2) an intervening change in the law has oc-

curred; or (3) the evidence on remand [is] substantially different." *Id.*

 We did not make any determination as to this issue in the prior appeal. Our determinations were limited to the issues of whether the transfers under the SSAs constituted sales or secured loans and whether the lease payments constituted payment intangibles.

As to the bankruptcy court, it neither expressly nor implicitly decided whether the surety bonds were instruments or supporting obligations in its memorandum decision on the Partial Summary Judgment Motions. The bankruptcy court simply assumed that the surety bonds were supporting obligations because both NetBank and the trustee argued that the surety bonds were supporting obligations and determined that NetBank did not have a perfected security interest in the lease payments.

### C. *The Surety Bonds Are Supporting Obligations and Not Instruments*

The FDIC contends that a triable issue of material fact remains as to whether at least some of the surety bonds are instruments rather than purely supporting obligations. We disagree.

The FDIC argued that even if the surety bonds are supporting obligations, that characterization is not necessarily exclusive, and the surety bonds could be instruments as well. At oral argument, counsel for the trustee conceded that at least theoretically, collateral for a loan could be both a supporting obligation and an instrument, but denied that the surety bonds in this case could appropriately be characterized as instruments.

"The question of whether a particular document qualifies as an instrument under the U.C.C. is a question of law." *Coral Petroleum, Inc. v. Banque Paribas (In re Coral Petroleum)*, 50 B.R. 830, 837 (Bankr. S.D.Tex.1985). *See also Omega Envtl., Inc.*, 219 F.3d at 986 & n. 4 (determining whether a certificate of deposit is an instrument within the meaning of Va.Code § 8.9–105(1)(i)).

N.R.S. § 104.9102(1)(xxx) defines a "supporting obligation" as a letter-of-credit right or secondary obligation that supports the *payment* or performance of a general intangible. N.R.S. § 104.9102(1)(tt) defines an "instrument" for UCC Article 9 purposes (it is defined differently in UCC Article 3), as:

> a negotiable instrument or any other writing that evidences a right to the payment of a monetary obligation, is not itself a security agreement or lease, and is of a type that in ordinary course of business is transferred by delivery with any necessary endorsement or assignment.

 By their terms, the surety bonds are assignable.[32] In fact, CMC purported to transfer all rights under the surety bonds to NetBank under Article II, § 2.1(a)(iii) of the SSAs. However, the surety bonds are not transferred by delivery in the ordinary course of any party's business independent of the underlying equipment leases and lease payments. In fact, at oral argument, counsel for both

---

**32.** The record only contains copies of two lease bonds issued by Royal. Both lease bonds set forth the same terms, though each relates to a different lease. One lease bond concerns a lease known as Frontier Amwest Replacement 2001–1 Series 1—9809322, with the bond number FM999091 ("Frontier Am-

west lease bond"). The other lease bond concerns a lease known as Lakeland 2001–3 Series 1—K120561. There are multiple copies of the Frontier.Amwest lease bond in the record.

The record also includes a lease bond issued by AmWest, which appears substantially similar to the lease bonds issued by Royal.

parties confirmed that there is no "market" for the surety bonds.

In determining whether particular written documents are "instruments," "most courts defer to the realities of the marketplace rather than narrowly looking to the form of the writing." *McFarland v. Brier*, 850 A.2d 965, 975 (R.I.2004) (quoting *In re Omega Envt'l, Inc.*, 219 F.3d at 987) (internal quotation marks omitted). In this case, the reality is that the surety bonds have no meaningful existence independent of the equipment leases they support for security purposes. Indeed, numbered section 1 of the surety bonds provides that "[i]f all payments required by the Lease are made in accordance with the Lease provisions, then this obligation shall be void...."

Accordingly, the surety bonds do not represent absolute rights "to the payment of a monetary obligation." They do not provide for the payment of any sum certain. Rather, payments under the surety bonds are contingent on the existence of payment default(s) under the particular equipment leases to which they relate.[33] As stated in numbered section 2 of the surety bonds, "[t]his Lease Bond and the Surety's obligation constitute an uncondi-

tional and absolute guarantee of payment, not collection."

The surety bonds list CMC (and its successors and assigns) as the obligee and Royal as the surety. Reviewing a copy of a surety bond issued by Royal, we note that the surety bond was issued for Royal to underwrite the leases and to remedy any default in the lease payments. Specifically, the surety bond states in its preamble that Royal, as surety, "agrees to pay to the Obligee any amounts due and owing by the principal with regards to the lease." The surety bond further states that Royal "is responsible to Obligee for the individual underwriting of each lessee and Lease, including, but not limited to ... the accurate and timely performance by any subservicer designated by [Royal]." The record does not include any surety bonds with varying language.

An audit letter dated January 8, 2001 from Laura Moon, chief accounting officer for NetBank, to Charles Deyo, senior vice-president underwriting facility manager of Royal, further indicates that the surety bonds constitute supporting obligations, rather than instruments. Per the January 8, 2001 letter, Ms. Moon asked that Mr. Deyo confirm that the surety bonds guarantee payment by Royal to NetBank of all lease payments and any defaults thereon.[34]

---

33. Numbered section 5 of the surety bonds provides: "If the Obligee fails to receive a payment under the Lease from the Surety, as servicer or from any sub-servicer, on the scheduled due date, default under the Lease occurs. Upon such default, the Surety shall have thirty (30) days to cause the default to be remedied. The Surety shall make payment on this Bond to Obligee upon receipt of written demand from Obligee, within this 30 day period."

34. The January 8, 2001 letter specifically states:

In connection with an audit of our financial statements, please confirm the following information as of January 2, 2001 related to the attached listing of surety bonds

and return the signed confirmation in the accompanying self-addressed envelope. Please confirm that the attached listing of surety bonds correctly states surety bonds that have been underwritten and validly issued by Royal Indemnity Company to Net-Bank (Purchaser) on leases sold by Commercial Money Center, Inc. (Seller); that Royal Indemnity Company is the servicer of each lease (Servicer); that the surety bonds covering each lease are for the remaining term of each lease; that *all of the surety bonds guarantee payment by Royal Indemnity Company to the Purchaser of all scheduled lease payments; and that all of the surety bonds cover all forms of default and fraud by the related lessee, Seller, Servicer and any subservicer* (emphasis added).

The January 8, 2001 letter included a document titled, "Request for Confirmation" ("confirmation form"). The confirmation form asked that Royal verify whether the information regarding each surety bond was correct. At the October 8, 2003 deposition of Ms. Moon, she testified that she understood the purpose of the January 8, 2001 letter was "to confirm the arrangement [she] believed was in place with Royal." At a deposition on August 20, 2003, Mr. Deyo testified that he verified the surety bonds in question and signed the confirmation form.

By their terms, the surety bonds fundamentally are not instruments. They are supporting obligations provided for security purposes. The surety bonds guarantee lease payments up to a maximum amount in the event of default, but they do not stand independent of the underlying leases as monetary payment obligations. The surety bonds are not bought, sold, transferred or assigned as such. Based on the record before us, it appears that NetBank and Royal themselves understood and characterized the surety bonds as supporting obligations. As NetBank did not perfect its security interest in the lease payments, it did not perfect its security interest by possession of the supporting obligation surety bonds. Although the bankruptcy court did not make its decision on these grounds, there was no error in granting summary judgment in favor of the trustee avoiding NetBank's security interest in the surety bonds.[35]

## VI. CONCLUSION

Based on the record before us, NetBank did not properly perfect its security interest in either the lease payments or the surety bonds outside the preference period. The bankruptcy court did not err in granting summary judgment in favor of the trustee avoiding NetBank's security interest in the lease payments and the surety bonds. Therefore, we AFFIRM.

---

**35.** As noted above, we can affirm on any basis supported by the record. *Simo,* 316 F.3d at 980.