NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: | ) BAP Nos.  AZ-11-1661-DJuBr |
| | )              AZ-11-1662-DJuBr |
| ROGER THOMAS HAAG, | )              AZ-11-1663-DJuBr |
| | ) |
| Debtor. | ) Bk. No.   10-07917-EWH |
| | ) |
| | ) Adv. Nos. 10-01207-EWH |
| ROGER THOMAS HAAG, | )              10-01268-EWH |
| | ) |
| Appellant, | ) |
| | ) |
| v. | ) |
| | ) |
| NORTHWESTERN BANK; M&I BANK, | ) **M E M O R A N D U M**[1] |
| | ) |
| Appellees. | ) |

Argued and Submitted on September 19, 2012
at Phoenix, Arizona

Filed – September 27, 2012

Appeal from the United States Bankruptcy Court
for the District of Arizona

Honorable Eileen W. Hollowell, Bankruptcy Judge, Presiding

Appearances:     David Hindman of Mesch, Clark & Rothschild, P.C.,
argued for Appellant Roger Thomas Haag; Howard C.
Meyers of Burch & Cracchiolo, P.A. argued for
Appellee Northwestern Bank.

---

[1]     This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

1

Before: DUNN, JURY, and BRAND,[2] Bankruptcy Judges.

Two creditors filed separate adversary proceedings to challenge debtor's right to a discharge. The bankruptcy court consolidated the adversary proceedings and conducted a four-day trial on the issues raised in the adversary complaints. Ultimately, the bankruptcy court determined that the debtor was not entitled to a discharge solely on the basis that he intended to hinder or delay his largest creditor when, within a year prior to filing bankruptcy, he placed approximately $120,000 in cash in a safety deposit box with the admitted purpose of keeping it from the creditor, whom he believed was engaging in improper collection activities. The debtor appealed.[3] We AFFIRM.

## I. FACTS[4]

_____

[2] Hon. Julia W. Brand, United States Bankruptcy Judge for the Central District of California, sitting by designation.

[3] The bankruptcy court's judgment denying Appellant's discharge was docketed in both adversary proceedings and in the main case. Appellant filed an appeal from each of the judgments. The appeals were consolidated by the order of our motions panel on January 11, 2012. Though a named Appellee, M&I Bank is not participating in this consolidated appeal.

[4] Claims for relief were asserted in the adversary proceedings pursuant to §§ 523(a)(2)(B), 523(a)(4), 727(a)(2), 727(a)(3), 727(a)(4), and 727(a)(5). After the close of Appellee's case, the bankruptcy court dismissed the §§ 523(a)(4) and 727(a)(5) claims for relief. After trial, the bankruptcy court ruled in favor of Appellant on all but the § 727(a)(2) claim for relief, which is the subject of this appeal.

(continued...)

2

On July 27, 2009, Northwestern Bank ("NWB") obtained a judgment ("Judgment") against Roger Thomas Haag in the Circuit Court for the County of Leelanau, Michigan in the approximate amount of $1.7 million. The Judgment was based on Mr. Haag's personal guaranty of the debts of his failed business, HTI, Inc. ("HTI"). NWB domesticated the Judgment in Arizona on February 1, 2010.

The domestication of the Judgment in Arizona prompted Mr. Haag to file a voluntary chapter 7[5] petition in the Bankruptcy Court for the District of Arizona on March 23, 2010 ("Petition Date"), an action he had been contemplating since at least November 29, 2008.

NWB filed an adversary complaint seeking alternatively to have its debt excepted from the application of Mr. Haag's discharge, or

[4](...continued)

As his record on appeal, Appellant submitted five volumes of excerpts, the majority of which are the complete trial transcripts and the transcripts of closing arguments and the hearing on Appellant's motion for reconsideration, most of which are not relevant to the limited issue before the Panel. The factual record important in this appeal relates to evidence of the receipt of five tax refunds and various banking transactions through which the disposition of the proceeds of those refunds was traced. Yet Appellant did not provide the actual trial exhibits, which would have made that evidentiary record easily accessible. Instead, to put together the facts, it was necessary to read the entire transcript, and then go back to locate the factual information that actually relates to this appeal. The parties provided some assistance in their briefs, but the actual evidence would have made the exercise much easier.

[5]    Unless otherwise specified, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

to deny Mr. Haag his discharge altogether. After four days of trial, the bankruptcy court denied Mr. Haag a discharge, based solely on its finding that Mr. Haag intended to hinder or delay NWB in its efforts to collect on the Judgment.

Mr. Haag is an engineer with expertise in biosolids applications and in the construction of biosolids storage tanks. Mr. Haag was the sole owner of HTI, which built and installed precast concrete tanks for use in wastewater treatment plants.

Beginning in 2003, Mr. Haag and HTI began their banking relationship with NWB. By June 2007, HTI's line of credit with NWB had increased to $1.3 million. Mr. Haag and HTI had two options available to repay the NWB debt: generating funds through performance on HTI's contracts or the sale of HTI as a going concern. Following the 2007 collapse of the housing market, HTI was unable to obtain sufficient new business to support its debt payments to NWB. Mr. Haag thereafter obtained a buyer for HTI; however, the attempted sale ultimately failed in November 2008.

By email dated November 29, 2008, Mr. Haag advised NWB that he had retained counsel with the intent to file a personal chapter 7 case and to live on social security benefits and the IRAs held by Mr. Haag and his wife, Carol. Mr. Haag left HTI's office and everything in it, including HTI's books and records, in December 2008. Also in December 2008, Mr. Haag surrendered his residence to NWB and moved to Arizona.

In January 2009, NWB took possession of all HTI assets. Mr. Haag testified he fully cooperated with NWB in turning over

HTI's equipment. By letter dated January 17, 2009 ("January 2009 Letter"), Ms. Haag advised NWB that "[Mr. Haag's] only income is unemployment, social security, and IRAs." At the end of the January 2009 Letter is a statement by Mr. Haag that he had read and approved the January 2009 Letter.

Beginning in February of 2009,[6] Mr. Haag received a total of $231,838 from refunds of taxes for the years 2007 and 2008: $12,549 from the State of Michigan as a refund of personal income taxes; $61,206 as a refund of federal personal income taxes; $68,194 from a federal income tax refund attributable to a loss carry forward; $13,114 from the State of Michigan attributable to a loss carry forward; and $76,775 from a federal income tax refund attributable to a loss carry forward. Some or all of the refund checks were deposited into Mr. Haag's personal checking account at the Bank of Tucson.

On July 11, 2009, less than three weeks before NWB obtained the Judgment, Mr. Haag withdrew $120,000 in cash from the Bank of Tucson account and placed it in a safety deposit box he and Ms. Haag rented jointly at Wachovia Bank. When asked at trial why he had converted $120,000 from his Bank of Tucson account to cash, Mr. Haag responded: "I guess the reason was that I felt at some point in time [NWB] had taken – gotten into stuff that I didn't think they should get into, so I took it out in cash." In subsequent

---

[6] Ms. Haag testified that she believed that Mr. Haag started receiving the tax refunds in February of 2009.

5

testimony, he stated: "I didn't feel comfortable with leaving it in a bank. If I had the cash in my hand and if something -- somebody decided that they wanted to take it from me if it was in a bank, I'd have to get a lawyer to try to get it back. And it was much easier for me to take it as cash because I knew I needed it to live on." Ms. Haag also testified at trial that the process of taking $120,000 of the tax refunds proceeds from Mr. Haag's Bank of Tucson account in cash, putting it in the safety deposit box at Wachovia Bank, and then depositing some of the cash into her bank accounts was done "[b]ecause we were nervous because we felt our opinion that [NWB] had been quite aggressive with us, and I just felt that this was an appropriate way to manage the tax returns." Mr. Haag asserts that in moving the cash to the safety deposit box he merely was acting to protect himself from improper conduct by NWB. Specifically, he was protecting his right to privacy and his financial information from improper inquiries by NWB.

By the Petition Date, some eight months after Mr. Haag put the $120,000 cash into the safety deposit box, the cash was, in Mr. Haag's words, "long gone."[7] Mr. Haag did not keep records of how or when the money was taken from the safety deposit box and spent. Nevertheless, the record establishes that he and/or Ms. Haag removed cash from the safety deposit box, and that Ms. Haag spent the cash on what Mr. Haag characterized as reasonable expenses. The

---

[7] Ms. Haag testified that when she filed for a legal separation from Mr. Haag in September 2009 [see n.8], there was no money left in the safety deposit box.

6

record is undisputed that Ms. Haag used cash from the safety deposit box, in part, for the following: $37,000 to remodel a condo in Mexico owned by Mr. Haag, at least $18,000 to purchase new furnishings for the remodeled condo in Mexico, and $2,000 to an attorney Ms. Haag hired to draft a separation agreement through which she became legally separated from Mr. Haag and was "awarded" the condo in Mexico.[8]

The bankruptcy court ultimately found that within one year prior to the Petition Date, Mr. Haag withdrew $120,00 in cash from his account at the Bank of Tucson and placed it in a safety deposit box he jointly owned with Ms. Haag; that he converted the funds in his bank account to cash because he was concerned about collection action by NWB; that between July and November of 2009, at least

---

[8] Ms. Haag is a successful business woman. Ms. Haag acted as CFO of HTI and managed HTI's banking relationship with NWB. NWB believes Ms. Haag prepared, and Mr. Haag provided, fraudulent financial statements to NWB.

The Haags maintained separate bank accounts and separate assets.

In August 2009, the Haags participated in a Mexican marriage ceremony, likely as a renewal of their vows as their 40th anniversary approached. In September 2009, they signed the separation agreement. A short time thereafter they took an overseas trip together which they referred to as their "anniversary" vacation. Mr. Haag's explanation as to why they took the trip was that it already had been paid for. They still travel together for family visits.

At the time of trial in 2011, the Haags still had not told all of their children they were legally separated. Ms. Haag frequently stays at the Arizona condo Mr. Haag claims as his residence. Mr. Haag explained that the separation agreement "awarded" her the use of a room there.

$36,000 of the cash from the safety deposit box was deposited by Ms. Haag into her personal checking account; and that Ms. Haag used the cash received from Mr. Haag to pay family and business expenses. The bankruptcy court concluded that the transfer of money from the Bank of Tucson account to a safety deposit box jointly owned with Ms. Haag was a transfer of property by Mr. Haag, that the removal of cash from the safety deposit box into Ms. Haag's individual account was a transfer, and that Mr. Haag transferred the money with a subjective intent to hinder or delay. Finally, while the bankruptcy court determined that Mr. Haag's admission that he intended to hinder or delay NWB in its collection activities was sufficient to deny Mr. Haag his discharge, the bankruptcy court noted that, even without his admission, there were sufficient badges of fraud to support a finding of intent: the close relationship between Mr. Haag and Ms. Haag, Mr. Haag's poor financial condition at the time of the transfers, and the lack of any consideration for the transfers.

After his motion for reconsideration was denied, Mr. Haag filed a timely notice of appeal asking that we determine that the bankruptcy court erred in finding that his actions constituted an intent to hinder sufficient to deny his discharge pursuant to § 727(a)(2).

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(J). We have jurisdiction under 28 U.S.C. § 158.

8

# III. ISSUES

Whether the bankruptcy court erred when it found that Mr. Haag intended to hinder or delay NWB in its efforts to collect on the Judgment when he withdrew $120,000 from his Bank of Tucson account and placed it in a safety deposit box to which he and Ms. Haag had access.

Whether the bankruptcy court erred when it denied Mr. Haag a discharge.

# IV. STANDARDS OF REVIEW

[T]he Ninth Circuit standard of review of a judgment on an objection to discharge is that: (1) the court's determinations of the historical facts are reviewed for clear error; (2) the selection of the applicable legal rules under § 727 is reviewed de novo; and (3) the application of the facts to those rules requiring the exercise of judgments about values animating the rules is reviewed de novo.

Searles v. Riley (In re Searles), 317 B.R. 368, 373 (9th Cir. BAP 2004), aff'd, 212 Fed. Appx. 589 (9th Cir. 2006).

A factual finding is clearly erroneous if the appellate court, after reviewing the record, has a firm and definite conviction that a mistake has been made. Wall Street Plaza, LLC v. JSJF Corp. (In re JSJF Corp.), 344 B.R. 94, 99 (9th Cir. BAP 2006). If two views of the evidence are possible, the trial judge's choice between them cannot be clearly erroneous. Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 574 (1985); Hansen v. Moore (In re Hansen), 368 B.R. 868, 874-75 (9th Cir. BAP 2007).

"De novo means review is independent, with no deference given to the trial court's conclusion. See First Ave. W. Bldg., LLC v.

James (In re Onecast Media, Inc.), 439 F.3d 558, 561 (9th Cir. 2006)." Mwangi v. Wells Fargo Bank, N.A. (In re Mwangi), 432 B.R. 812, 818 (9th Cir. BAP 2010).

We may affirm the bankruptcy court's ruling on any basis supported by the record. See, e.g., Heilman v. Heilman (In re Heilman), 430 B.R. 213, 216 (9th Cir. BAP 2010); FDIC v. Kipperman (In re Commercial Money Center, Inc.), 392 B.R. 814, 826-27 (9th Cir. BAP 2008); see also McSherry v. City of Long Beach, 584 F.3d 1129, 1135 (9th Cir. 2009).

## V. DISCUSSION

### A. General Considerations.

Many debtors seek a fresh start, available to them by virtue of the discharge provisions of the Bankruptcy Code, when they have become unable to meet their financial obligations. The bankruptcy court denied Mr. Haag a discharge, and in this appeal, we are asked to determine whether the bankruptcy court erred when it did so.

In our review of the bankruptcy court's findings of fact and conclusions of law, we are guided by certain general principles governing denial of discharge claims. Most important is the admonition that "[a] denial of a discharge is an act of mammoth proportions, and must not be taken lightly. In light of this gravity . . . Section 727 must be construed liberally in favor of the debtor and against the objector." In re Goldstein, 66 B.R. 909, 917 (Bankr. W.D. Pa. 1986). See First Beverly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1342 (9th Cir. 1986); Devers v. Bank of Sheridan (In re Devers), 759 F.2d 751, 754 (9th Cir. 1985). The

10

opposing tension to this admonition is that the bankruptcy discharge and its opportunity for a fresh start are available only to the "honest but unfortunate debtor."  See Cohen v. De La Cruz, 523 U.S. 213, 217 (1998), citing Grogan v. Garner, 498 U.S. 279, 286-87 (1990).

Finally, a party objecting to the debtor's discharge has the burden of proving, by a preponderance of the evidence, that the debtor's actions or conduct fall within one of the exceptions to discharge set forth in § 727.  Grogan v. Garner, 498 U.S. at 289.

With these guidelines in mind, we turn to our review of the specific issues in this appeal.

B.    The Record Supports Denial of Mr. Haag's Discharge Under § 727(a)(2).

As relevant to this appeal, § 727(a)(2) provides:

(a) The court shall grant the debtor a discharge, unless–
. . .
    (2) the debtor, with intent to hinder, delay, **or** defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed –
        (A) property of the debtor, within one year before the date of the filing of the petition[9] . . . .

(Emphasis added.)

To prevail on its claim for relief under § 727(a)(2)(A), NWB

---

[9]    There is no dispute that all relevant events occurred within one year before the Petition Date.  The property with which we are concerned in this appeal are the proceeds of the tax refunds Mr. Haag took from his bank account and placed into the safety deposit box at Wachovia Bank in July 2009.

11

was required to prove two things: "(1) a disposition of property, such as transfer or concealment, and (2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act [of] disposing of the property." Hughes v. Lawson (In re Lawson), 122 F.3d 1237, 1240 (9th Cir. 1997). Ninth Circuit case law makes clear that Mr. Haag's intent need not have been fraudulent. "Because the language of the statute is in the disjunctive it is sufficient if the debtor's intent is to hinder or delay a creditor." Retz v. Samson (In re Retz), 606 F.3d 1189, 1198 (9th Cir. 2010), citing Bernard v. Sheaffer (In re Bernard), 96 F.3d 1279, 1281 (9th Cir. 1996).

The term "transfer" is defined by the Bankruptcy Code to mean:

> (A) the creation of a lien;
> (B) the retention of title as a security interest;
> (C) the foreclosure of a debtor's equity of redemption; or
> (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with –
> (I) property; or
> (ii) an interest in property.

Section 101(54).

A withdrawal from a bank account is a transfer. See In re Bernard, 96 F.3d at 1283. As explained by the Bernard court:

> Instead of owning money sitting in their accounts, the Bernards owned claims against their bank. When they withdrew from their accounts, they exchanged debt for money (which, more than incidentally, was more difficult for the Sheaffers to acquire). Thus, when the Bernards made their withdrawals they parted with property, satisfying the Code's definition of transfer.

Id. The Ninth Circuit determined that the mere act of removing the money from their bank account in order to hinder their creditors

12

warranted denial of the Bernards' discharge.

Here, in addition to transferring $120,000 in cash from his Bank of Tucson account, Mr. Haag took the further step of placing the $120,000 cash into a safety deposit box at Wachovia Bank to which only he and Ms. Haag had access, thereby concealing it from his creditors, including NWB.[10] Further, each time cash was removed from the safety deposit box and placed in Ms. Haag's control, there was a separate transfer.

Mr. Haag asserts on appeal that the bankruptcy court erred in finding he held an actual intent to hinder or delay NWB. Mr. Haag faults the bankruptcy court for relying only on his "admission" that he placed cash into the safety deposit box out of concern about NWB's collection efforts. He asserts that the bankruptcy court failed to consider all of the circumstantial evidence and inferences from his conduct.

We note that "[w]hen a debtor admits that he acted with the intent penalized by section 727(a)(2)(A), there is no need for the court to rely on circumstantial evidence or inferences in determining whether the debtor had the requisite intent." First Beverly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1343 (9th Cir. 1986). We further note that, notwithstanding the sufficiency of Mr. Haag's admission of intent to hinder or delay, the bankruptcy court buttressed its conclusion with additional findings that

---

[10] The term "conceal" means "[t]o keep from being seen, found, observed, or discovered; hide." The American Heritage Dictionary of the English Language, 4th ed. p. 381 (2000).

13

sufficient badges of fraud were present to support an inference of fraud under § 727(a)(2), utilizing the proper standard articulated in Emmett Valley Assocs. v. Woodfield (In re Woodfield), 978 F.2d 516 (9th Cir. 1992). Mr. Haag simply does not like the additional findings.

In Mr. Haag's view, the "admission" itself needed to be considered within the circumstances as they existed. In particular, Mr. Haag points out that both he and his wife testified that he withdrew cash and placed it in a safety deposit box because "(1) they needed cash for their expenses in Mexico and (2) to protect against improper conduct of NWB including privacy violations." Appellant's Opening Brief at 13:3-4. He further asserts (1) that it is "uncontested" that all funds in the safety deposit box were used for the payment of his reasonable business, medical, legal, and living expenses, (2) that his course of conduct demonstrated "an ongoing intent to cooperate with all lawful collection actions against him," and (3) that there was no evidence that he "misled or deflected creditors."

We find these assertions troubling based on the record before us. The bankruptcy court made no finding as to the reasonableness of the expenses for which the $120,000 cash was used. We would not characterize a complete remodeling and redecorating of a second residence in a foreign country as an "ordinary" expense for anyone, most especially for an insolvent debtor, so we find it difficult to determine how the expense could be found to be reasonable. Neither do we see in the record the "ongoing intent to cooperate" with NWB.

14

The record in fact suggests a longer-term plan to conceal the existence of the tax refunds from NWB. Specifically, Mr. Haag twice communicated with NWB to volunteer to them the information that his only sources of funds on which he would be living were IRAs, social security benefits, and unemployment benefits. These representations were made in December of 2008 and in January of 2009. Within a month of the last representation, he began receiving large tax refunds. It is inconceivable that it was only after January 17, 2009 that Mr. Haag realized he was entitled to these substantial refunds, gathered his records for the preparation of the returns, prepared the returns, and had the good fortune to have the returns expeditiously processed by the taxing authorities and the refunds disbursed.

Finally, Mr. Haag asserts that seeking haven from untoward creditor behavior and intending to hinder or delay are "not mutually exclusive." Beauchamp v. Hoose (In re Beauchamp), 236 B.R. 727, 731 (9th Cir. BAP 1999). In other words, he asserts that both intentions can exist, and, under his reading of Beauchamp, because the bankruptcy court did not make an explicit finding that Mr. Haag was not acting to protect his privacy when he placed cash in the safety deposit box, the existence of the safe haven intention precludes a finding that Mr. Haag had the intent to hinder or delay the creditor. We do not read Beauchamp to require the bankruptcy court to explicitly reject alternate, co-existing motivations. In concluding that Mr. Haag possessed the requisite intent to hinder or delay NWB, the bankruptcy court may even have recognized, but

15

discounted Mr. Haag's intent to seek a safe haven.[11]  We observe that a debtor's belief that his conduct was morally justifiable does not provide a defense to § 727(a)(2) allegations.  See 6 COLLIER ON BANKRUPTCY ¶ 727.02[3][a](Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2012).

The bankruptcy court did not err when it denied Mr. Haag his discharge.

## VI.  CONCLUSION

The bankruptcy court's findings that Mr. Haag placed $120,000 in cash into a safety deposit box, which funds subsequently were spent by Mr. Haag and his wife, with the intent to hinder or delay NWB in its efforts to collect its Judgment are more than adequately supported by the record.  We AFFIRM.

---

[11]  Mr. Haag's concern about violation of his privacy rights seems to have arisen when NWB made inquiries about the Haags' IRAs as potential sources of recovery.  At trial, his attorney attempted to make that point.  Mr. Haag's response is illuminating as to the true nature of his concern about his "privacy" rights:

    Q:  So you were concerned about your privacy related to your IRA?
    A:  Yes, I was.  That's all we had to live on.